IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2003 Session

# CONSOLIDATED WASTE SYSTEMS, LLC v. METRO GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

**Appeal from the Circuit Court for Davidson County**
**No. 01C895      Walter C. Kurtz, Judge**

---

**No. M2002-02582-COA-R3-CV - Filed June 30, 2005**

---

A would-be developer of a construction and demolition landfill sued the Metropolitan Government after its legislative body adopted zoning amendments that would effectively preclude the proposed landfill on the property the company had leased with an option to purchase. The company attacked the ordinances on multiple grounds and was successful in having the trial court declare them unconstitutional as violative of substantive due process and equal protection. Because of the company's limited interest in the real property, however, the court refused to grant an injunction prohibiting the enforcement of the ordinances against the company or to award damages. The trial court also awarded attorney's fees to the company. The Metropolitan Government appeals the holding that the ordinances were unconstitutional on the merits as well as on a number of procedural grounds and also appeals the award of attorney's fees. The company appeals the trial court's decision that the ordinances did not constitute exclusionary zoning. We affirm the trial court on all issues.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

C. Dawn Deaner, Daniel Champney, Thomas Cross, Nashville, Tennessee, for the appellant, The Metropolitan Government of Nashville and Davidson County.

James L. Murphy, III; Colin J. Carnahan, Nashville, Tennessee, for the appellee, Consolidated Waste Systems, LLC.

**OPINION**

This case arises from the passage by the Metropolitan Government of Nashville and Davidson County Council of two amendments to its zoning ordinance that regulated the location of construction and demolition ("C&D") landfills within the county. The ordinances had the effect of precluding the development of such a landfill on real property that Consolidated Waste Systems, L.L.C. ("Consolidated") had leased with an option to purchase for the purpose of developing a C&D landfill prior to the amendments.

Consolidated filed a lawsuit challenging the legislative amendments to the zoning ordinance based on a number of claims, including:

(1) That the ordinances constituted exclusionary zoning since they were intended to and had the effect of precluding C&D landfills anywhere in the county.

(2) That the ordinances deprived Consolidated of its interest in the real property in violation of constitutional provisions requiring substantive due process.

(3) That the ordinances deprived Consolidated of equal protection of the laws in violation of both the Tennessee and United States Constitutions.

(4) That the ordinances constituted an unconstitutional taking of Consolidated's interest in the property.

The trial court decided the issues on the parties' cross motions for summary judgment, disposing of the issues as matters of law. The trial court held that the ordinances did not constitute exclusionary zoning and that Consolidated did not have standing to bring a takings claim. However, the court found the ordinances facially unconstitutional as violative of due process and equal protection. The court found Consolidated was entitled to declaratory judgment on those issues, but was not entitled to an injunction or damages. Both parties have appealed parts the trial court's judgment as well as subsequent actions by the trial court that will be discussed later in this opinion.[1]

---

[1]The trial court enjoined Consolidated from taking steps to develop the C&D landfill on the basis new ordinances designed to address the constitutional claims made herein were proceeding through Council. We were informed at oral argument that those ordinances were enacted into law within the time frame established by the court and that they replaced the ordinances challenged in this action. The new ordinances are not before us in this appeal. Because of the repeal or replacement of the ordinances at issue here, we are aware that our decision may have little practical effect on the parties, with the exception of our decision as to the award of attorney's fees. That question requires a review of the trial court's decisions on the merits of the substantive issues, and we cannot avoid that complex undertaking. A viable claim for damages saves a case from dismissal as moot in appeals involving challenges to legislation that has been amended. *Khodara Environmental, Inc. v. Beckman*, 237 F.3d 186, 196 (3d Cir. 2001) (distinguishing between the facial challenge for declaratory relief, which was moot, and the as-applied claim for damages, which was not).

## I. FACTS

In late 1999, Consolidated obtained an option to purchase 138.6 acres in Davidson County and signed a lease on the property on February 3, 2000. Consolidated intended to build a C&D landfill on the property and had investigated potential sites of over 100 acres that were located in zoning districts where such use was permitted as a matter of right. Consolidated concluded that the property at issue was the only appropriate site in Davidson County. At the time of the option, the property was located in an Industrial Restricted ("IR") zoning district, meaning that C&D landfills were a permitted use without the requirement of a special exception or variance. The lease, which was for the period that Consolidated retained the right to purchase the land, authorized preparatory work for the construction of the C&D landfill.

On December 29, 1999, Consolidated applied to the Tennessee Department of Environment and Conservation for a solid waste disposal facility permit, and the permit for construction of a C&D landfill was issued on December 13, 2000.

The first of the two ordinances at issue herein, Bill No. BL 99-86, was introduced on November 16, 1999. It prohibited the location of a C&D landfill within three (3) miles of a school or park; however, it only applied in those zoning districts where a C&D landfill was permitted as a special exception or with certain conditions.

Because the bill was an amendment to the zoning ordinance, it was referred to the Metropolitan Planning Commission. The Commission staff recommended disapproval of the 3-mile buffering provision because its limited application to only certain zoning districts would result in anomalous situations, because the buffering requirement did not apply to other types of landfills, and because there was no basis for establishing the proposed three mile standard. The Commission voted to recommend disapproval of the bill because there was no supportable basis for choosing three miles as the buffer. The Commission stated more research was needed to determine what distance, if any, would be appropriate and also to determine whether such a buffer or restriction should apply to other types of landfills. The Council amended the first bill to make the buffering requirement two miles instead of three. The Planning Commission recommended disapproval again.

On its own, the first ordinance would not have affected the property at issue because even though it was less than two miles from a park, it was located in a zoning district where C&D landfills were permitted by right. The second ordinance, BL 2000-171, was introduced on February 1, 2000. It did two things: (1) made C&D landfills permissible in IR and IG zoning districts only as a PC use, or with certain conditions, and (2) extended the two-mile buffering requirement established in the first bill to all C&D landfills.

The Metropolitan Planning Commission recommended disapproval of both the amended first ordinance and the second ordinance because there was no planning basis to support any increased separation between landfills and other non-residential uses and no planning basis to support further restriction of C&D landfills in the IR and IG zoning districts.

Both ordinances passed in the Council on March 21, 2000 and were signed by the Mayor on March 27, 2000. In October of 2000, the Metro Department of Codes Administration notified Consolidated that it would be unable to obtain a permit for construction of the C&D landfill because the property was located within two miles of a park. That letter also said that the proposed landfill met every other requirement of applicable provisions of the zoning code and listed those requirements.

## II. THE CONSTITUTIONAL CHALLENGES

The different requirements for different types of challenges to a zoning ordinance are the subject of many of the arguments herein. Traditionally, ordinances regulating the private use of land have been subject to legal challenges by any or all of several types of claims alleging violations of Constitutional provisions. A number of courts have attempted, at various times, to categorize the types of available claims. *See Pearson v. City of Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992) (discussing various types of "federal zoning claims"); *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1211 n. 1 (11th Cir. 1995); *Eide v. Sarasota County*, 908 F.2d 716, 720-22 (11th Cir. 1990), *cert. denied*, 498 U.S. 1120, 111 S.Ct. 1073 (1991). These have generally included challenges based on the Takings Clause and challenges based on substantive due process and equal protection grounds, sometimes with subclassifications such as due process taking. Of course, a zoning ordinance is subject to challenge on its face or on the effect of the ordinance as applied. We think the Eleventh Circuit's more recent description of the types of constitutional claims available to contest a land use regulation, whether an ordinance or an administrative decision, is consistent with the development of the law. In *Villas of Lake Jackson, Ltd. v. Leon County*, 121 F.3d 610, (11th Cir. 1997), that court stated:

> Any constitutional right based upon a zoning regulation governing a specific use of real property, to the extent the claim is based upon the deprivation of the right to use the property itself for that specific purpose, is protectable, if it is a right for which the Constitution gives protection at all, by only these causes of action:
>
> 1. A procedural due process claim challenging the procedures by which the regulation was adopted;
>
> 2. A substantive due process claim based upon the arbitrary and capricious action of the government in adopting the regulation;
>
> 3. A Takings Clause claim which may seek not only just compensation, if the regulation amounts to a taking, but may seek invalidation and injunctive relief if the regulation exceeds what the government body may do under the Takings Clause of the Constitution;
>
> 4. Claims under some other constitutional provision that give the landowner a protectable right, not specifically involved with the real

property right itself, . . . [*e.g.*,] a claim alleging a violation of the Equal Protection Clause of the Constitution.

Consolidated originally brought a regulatory takings claim as well as a facial challenge to the ordinances on substantive due process and equal protection grounds. The trial court found that Consolidated had no vested right in the property and, consequently, no standing to bring a claim for just compensation for a taking.[2] In addition, with regard to the substantive due process and equal protection claims, the trial court determined that Consolidated did not have sufficient interest to be entitled to damages or immediate injunctive relief. The court held, however, that Consolidated could still challenge the ordinances as facially unconstitutional, and, if successful, would only be entitled to prospective relief in the form of a declaratory judgment, citing *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534, 112 S. Ct. 1522, 1532 (1992). The court granted the declaratory judgment finding the ordinances unconstitutional.

On appeal, the Metropolitan Government argues that the trial court was in error in allowing Consolidated to proceed on its substantive due process and equal protection challenges to the ordinance on various grounds: (1) Consolidated could not bring a facial challenge to the ordinances on substantive due process grounds because the true nature of its claim was an unconstitutional taking, and substantive due process claims are subsumed into that more explicit textual source of protection from the conduct at issue; (2) a taking claim cannot be brought as a substantive due process claim and thereby avoid ripeness requirements and, since the taking claim herein was not ripe for review, neither were the substantive due process and equal protection claims; (3) Consolidated had no vested right in the property and lacked a sufficient property interest to have standing to bring even a facial challenge to the ordinances on substantive due process grounds. The Metropolitan Government also argues that the trial court was wrong in its decision on the merits of the constitutional claims because a rational basis exists to support the ordinances.

We begin our analysis with the law of substantive due process and equal protection, including the requirements for bringing those claims. Then, because of the arguments made, we will examine the law of governmental takings and the relationship between taking claims and the other constitutional claims.

---

[2]The trial court held that Consolidated had not undertaken sufficient action with regard to the property, accomplished substantial construction, or incurred substantial liabilities so as to have a vested right to build a C&D landfill on the property under the zoning law as it existed prior to the two amendments at issue herein, relying primarily on *State ex rel. SCA Chemical Waste Serv., Inc. v. Konigsberg*, 636 S.W.2d 430 (Tenn. 1982). Based on that case and other authority, as well as on its finding that Consolidated had not substantially changed its position, the court found Consolidated had no vested right to give it standing "other than to make a facial challenge to the ordinances." On appeal, Consolidated does not challenge the trial court's finding that it had no standing to bring a takings claim for just compensation or to receive damages or injunctive relief for the due process and equal protection claims.

### III. SUBSTANTIVE DUE PROCESS

The Due Process Clause of the United States Constitution guarantees more than fair process; its substantive component prohibits certain government actions regardless of the fairness of the procedures used.

> Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action. . . . We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective.

*County of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S. Ct. 1708, 1716 (1998) (internal quotations and citations omitted). Thus, a substantive due process claim is based on the exercise of power without reasonable justification. Where government action does not deprive a plaintiff of a particular constitutional guarantee, that action will be upheld against a substantive due process challenge if it is rationally related to a legitimate state interest. *Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997), *cert. denied*, 522 U.S. 861, 118 S.Ct. 164 (1997).

This constitutional protection applies in the context of zoning. "[C]itizens have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1217 (6th Cir. 1992). Zoning ordinances and amendments thereto, such as the ones at issue in this case, have long been subject to constitutional challenge. In *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S. Ct. 114, 118 (1926), the United States Supreme Court held that zoning ordinances "must find their justification in some aspect of the police power, asserted for the public welfare."

A zoning ordinance is the product of legislative action[3] and, before it can be declared unconstitutional, a court must find that the provisions are clearly arbitrary and unreasonable, having no substantial relationship to the public health, safety, morals or general welfare. *Euclid*, 272 U.S. at 395, 47 S. Ct. at 121. A challenge to a zoning ordinance on the basis it violates substantive due process is analyzed using the rational basis standard. *Restigouche, Inc.* 59 F.3d at 1214. Under this standard, a legislative regulation of land use will be upheld if it has a rational relationship with a legitimate governmental interest or public welfare concern. *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1388 (11th Cir. 1996), *cert. denied*, 511 U.S. 1018, 114 S. Ct. 1400 (1994); *South County Sand & Gravel Co., Inc. v. Town of South Kingston*, 160 F.3d 834, 836 (1st Cir. 1998). A zoning ordinance is unconstitutional as violative of substantive due process if it is arbitrary, capricious or not rationally related to a legitimate public purpose. *WMX Technologies, Inc. v. Gasconade County,*

---

[3]Substantive due process guarantees apply to government activity that is both legislative and executive; however, the standard for determining whether action taken in a legislative capacity violates those guarantees is different from that applicable to executive conduct. *County of Sacramento*, 523 U.S. at 846, 118 S. Ct. at 1716.

*Mo.*, 105 F.3d 1195, 1198-99 (8th Cir. 1997).

> A local zoning ordinance survives a substantive due process challenge if there exists a rational relationship between the terms of the ordinance and a legitimate governmental purpose. *See Berger v. City of Mayfield Heights*, 154 F.3d 621, 624 (6th Cir. 1998); *see also Curto v. City of Harper Woods*, 954 F.2d 1237, 1243 (6th Cir. 1992) ("Under [a substantive due process] analysis, an ordinance or regulation is invalid if it fails to advance a legitimate governmental interest or if it is an unreasonable means of advancing a legitimate governmental interest."); *Pearson*, 961 F.2d at 1223 (noting that in substantive due process review of a zoning ordinance, "the only permissible inquiry" for a federal court is "whether the legislative action is rationally related to legitimate state land use concerns").

*Richardson v. Township of Brady*, 218 F.3d 508, 513 (6th Cir. 2000).

The Tennessee Supreme Court has often stated that the due process clause of the Tennessee Constitution is synonymous with the due process clause of the Fourteenth Amendment to the United States Constitution. *Gallaher v. Elam*, 104 S.W.3d 455, 463 (Tenn. 2003); *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997), *cert. denied*, 522 U.S. 982, 118 S. Ct. 444 (1997). Accordingly, courts in this state have applied the same substantive due process analysis as is applied in such challenges brought under the federal Constitution. *Newton v. Cox*, 878 S.W.2d 105, 110 (Tenn. 1994), *cert. denied*, 513 U.S. 869, 115 S. Ct. 189 (1994). "[U]nless a fundamental right is implicated,[4] a statute comports with substantive due process if it bears 'a reasonable relation to a proper legislative purpose' and is 'neither arbitrary nor discriminatory.'" *Gallaher*, 104 S.W.3d at 463, quoting *Riggs*, 941 S.W.2d at 51, quoting *Newton*, 878 S.W.2d at 110.

Whether or not they use the term substantive due process, Tennessee courts review zoning ordinances under the same rational basis test. *Fallin v. Knox County Bd. of Com'rs*, 656 S.W.2d 338, 342-43(Tenn. 1983). The test is whether the ordinance bears a reasonable relationship to the public health, safety, or welfare; if so, it is a valid exercise of police power. *Davidson County v. Rogers*, 184 Tenn. 3237, 332, 198 S.W.2d 812, 814 (1947); *Mobile Home City of Chattanooga v. Hamilton County*, 552 S.W.2d 86, 87 (Tenn. Ct. App. 1977), *cert. denied*, 431 U.S. 956, 97 S. Ct. 2678 (1977).

Under the "law of the land" provision of the Tennessee Constitution, a legislative body, through enactment of zoning legislation:

> may impose any limitation on the use of property which it may deem necessary or expedient to promote and protect the safety, health, morals, comfort, and welfare of the people, provided only that this power shall not be exercised arbitrarily; that is,

---

[4]In *Riggs*, a land use case, the parties recognized that the statute did not implicate a fundamental right. Consolidated does not assert a fundamental right or argue that anything other than the rational basis test applies.

7

without reasonable connection or relation between the limitation imposed and the public safety, health, or welfare, etc.

*Spencer-Sturla Co. v. City of Memphis*, 290 S.W. 608, 612 (Tenn 1927).

The rational basis test is applied with recognition of the deference to be given legislative decisions. Tennessee courts have long recognized the broad powers given to local legislative bodies to enact and amend zoning or land use regulations. *Fallin*, 656 S.W.2d at 342. Consequently, the scope of judicial review of the exercise of such legislative power is limited. *Id.* Because courts cannot substitute their judgment on local land use policy for that of local legislative bodies, they give considerable deference to the decisions of such bodies if the issues are fairly debatable. *See McCallen v. City of Memphis*, 786 S.W.2d 633, 640 (Tenn. 1990).

Thus, where the question is whether the legislature had a rational basis for the statute, if any reasonable justification for the law may be conceived, it must be upheld by the courts. *Riggs*, 941 S.W.2d at 48; *State v. Tester*, 879 S.W.2d 823, 830 (Tenn. 1994). Absent implication of a fundamental right, a legislative act will withstand a substantive due process challenge if the government identifies a legitimate governmental interest that the legislative body could rationally conclude was served by the legislative act. *Parks Properties v. Maury County*, 70 S.W.3d 735, 744-45 (Tenn. Ct. App. 2001).

In the case before us, the trial court found that the Metropolitan Government had "failed to connect a rational relationship between these ordinances and a legitimate governmental purpose."

## IV. EQUAL PROTECTION

The Tennessee Constitution's equal protection provisions confer "essentially the same protection" as the equal protection clause of the United States Constitution. *Riggs*, 941 S.W.2d at 52; *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn. 1993). Both guarantee that all persons who are similarly situated will be treated alike by the government and by the law. *Id.*, at 153; *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249 (1985); *Richland Bookmark, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir. 2002), *cert. denied*, 537 U.S. 823, 123 S. Ct. 109 (2002).

Equal protection challenges are based upon governmental classifications. In considering an equal protection challenge to a legislative act, Tennessee courts follow the analytical framework established by the United States Supreme Court. *Riggs*, 941 S.W.2d at 52; *Newton*, 878 S.W.2d at 109. Strict scrutiny is required only when the classification interferes with a fundamental right or operates to the peculiar disadvantage of a suspect class. *Riggs*, 941 S.W.2d at 52; *State v. Tester*, 879 S.W.2d at 828. The standard of reduced scrutiny applies in most other situations,[5] requiring only

---

[5]In *Tester*, our Supreme Court confirmed the existence of a middle standard of "heightened" scrutiny, but the case before us does not fall within those situations justifying such scrutiny. *Tester*, 879 S.W.2d at 828.

that a rational basis exist for the classification, or that the classification have a reasonable relationship to a legitimate state interest. *Id.*

The parties do not disagree that reduced scrutiny is the applicable standard. Thus, as in the substantive due process challenge, the zoning ordinances must be reviewed under the rational basis test. The rational basis analysis used in an equal protection challenge does not differ in substantial regard from the rational basis test used when considering a substantive due process claim. Equal protection requires only that the legislative classification be rationally related to the objective it seeks to achieve. *Wilson v. Yaklich*, 148 F.3d 596, 604 (6th Cir. 1998) 52*cert. denied*, 5 U.S. 1139, 119 S. Ct. 1028 (1999); *City of Chattanooga v. Davis*, 54 S.W.3d 248, 276 (Tenn. 2001); *Newton,* 878 S.W.2d at 110.

With due deference to legislative decision making, "[i]f some reasonable basis can be found for the classification [in the statute] or if any state of facts may reasonably be conceived to justify it, the classification will be upheld." *Riggs*, 941 S.W.2d at 53, quoting *Tennessee Small Sch. Sys.*, 851 S.W.2d at 153. More specifically, legislative bodies are allowed considerable latitude in establishing classifications and thereby determining what groups are similarly situated. *Plyler v. Doe*, 457 U.S. 202, 216, 102 S. Ct. 2382, 2394 (1982); *City of Chattanooga*, 54 S.W.3d at 276; *State v. Smoky Mountain Secrets, Inc.*, 937 S.W.2d 905, 912 (Tenn. 1996). Courts presume that the legislature acted constitutionally and will uphold the statute "if any state of facts can reasonably be conceived to justify the classification or if the unreasonableness of the class is fairly debatable. . . ." *City of Chattanooga*, 54 S.W.3d at 276, quoting *Bates v. Alexander*, 749 S.W.2d 742, 743 (Tenn. 1988).

Consolidated asserted that the ordinances deprive it of equal protection of the law because they treat C&D landfills differently from other types of landfills and industrial uses by requiring the two-mile buffer. The trial court agreed and, for reasons similar to those underlying its substantive due process decision, held that the ordinances, on their face, violated Constitutional equal protection guarantees.

## V. THE LAW OF GOVERNMENTAL TAKINGS

Even though Consolidated has not appealed the trial court's dismissal of its takings claim,[6] the issues raised by the Metropolitan Government and issues created by the intersection of the law of takings and the other constitutional challenges brought herein necessitate some discussion of the law of governmental takings.

---

[6]In its complaint, Consolidated alleged that the ordinances resulted in a temporary taking of its interest in the property, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 21 of the Tennessee Constitution.

## A. FEDERAL HOLDINGS

The Fifth Amendment to the United States Constitution guarantees that no person shall "be deprived of life, liberty, or property, without due process of law" and also provides, "nor shall private property be taken for public use, without just compensation." The second provision is called the Takings Clause, or sometimes the Just Compensation Clause, and it is predicated on the proposition that the government should pay for private property it has taken for its own use.[7] The purpose of the Takings Clause is to prevent the government from forcing an individual or group of individuals alone to bear burdens "which, in all fairness and justice, should be borne by the public as a whole." *Palazzolo v. Rhode Island*, 533 U.S. 606, 618, 121 S.Ct. 2448, 2457-58 (2001); *Dolan v. City of Tigard*, 512 U.S. 374, 384, 114 S.Ct. 2309, 2316 (1994); *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569 (1960).

A taking of property for public use violates the Takings Clause only if just compensation is not paid.[8] *Lingle v. Chevron U.S.A., Inc.*, __ U.S. ___, 125 S.Ct. 2074, 2080 (May 23, 2005). "The Fifth Amendment does not proscribe the taking of property, it proscribes taking without compensation." *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194, 105 S. Ct. 3108, 3120 (1985).

The federal law of regulatory takings has evolved over the years, including a number of qualifications and distinctions that we need not examine. At the risk of oversimplifying a complex area of the law,[9] some general principles can be stated.

The case before us initially involved a claim of regulatory, not physical, taking through the adoption of a zoning ordinance. The Takings Clause of the United States Constitution was generally

---

[7]The Takings Clause applies to the states through the Fourteenth Amendment. *Legal Foundation of Washington*, 538 U.S. at 232 n.6, 123 S. Ct. at 1417 n. 6; *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 2457 (2001); *Chicago, B.&Q. R. Co. v. Chicago*, 166 U.S. 226, 239, 17 S. Ct. 581, 586 (1897).

[8]A governmental taking of private property from one citizen for the private use of another is also unconstitutional, regardless of whether compensation is paid. *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 241, 104 S. Ct. 2321, 2329 (1984). The test is whether the taking serves a public purpose. *Kelo v. New London*, __ U.S. ___, 2005 WL 1469529 (June 23, 2005).

[9]"[I]t is fair to say [the regulatory takings concept] has proved difficult to explain in theory and to implement in practice. Cases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 541, 118 S.Ct. 2131, 2155 (1998) (Kennedy J., concurring in the judgment and dissenting in part). *See also Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123-24, 98 S. Ct. 2646, 2659 (1978) (stating that the question of what constitutes a regulatory taking "has proved to be a problem of considerable difficulty"); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 866 (Stevens J., dissenting) ("Even the wisest lawyers would have to acknowledge great uncertainty about the scope of this Court's takings jurisprudence.")

understood to apply only to physical takings[10] until the United States Supreme Court held in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 160 (1922) that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." The Court has repeatedly stated there is no set formula for determining when a regulation goes too far. *Lingle*, 125 S.Ct. at 2081; *Palazzolo*, 533 U.S. at 617, 121 S.Ct. at 2457; *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893 (1992) (". . . we have generally eschewed any set formula for determining how far is too far  . . .").

The principles that have emerged in takings jurisprudence are attempts to apply the "fairness and justice" purposes underlying the Takings Clause, as explained in *Armstrong*, *supra*. *See*, *e.g.*, *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321, 122 S. Ct. 1465, 1478 (2002) (referring to the *Armstrong* principles). The United States Supreme Court has described its Takings or Just Compensation Clause holdings as follows:

> The text of the Fifth Amendment itself provides a basis for drawing a distinction between physical takings and regulatory takings. Its plain language requires the payment of compensation whenever the government acquires private property for a public purpose, whether the acquisition is the result of a condemnation proceeding or a physical appropriation. But the Constitution contains no comparable reference to regulations that prohibit a property owner from making certain uses of her private property. Our jurisprudence involving condemnations and physical takings is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules. Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by 'essentially ad hoc, factual inquiries,' designed to allow 'careful examination and weighing of all the relevant circumstances.'

*Brown v. Legal Foundation of Washington*, 538 U.S. at 233, 123 S. Ct. at 1417-18, quoting *Palazzolo*, 533 U.S. at 636 (O'Connor, J., concurring). *See also Yee v. Escondido*, 503 U.S. at 519, 523, 112 S. Ct. 1522, 1526 (1992) (explaining the difference between physical takings and regulatory takings and the need for complex factual assessments in the latter).

The ad hoc inquiry described in *Brown* was established in *Penn Central Transportation Co. v. New York City*, 438 U. S. 104, 124-25, 98 S. Ct. 2646, 2659-60 (1978), wherein the Court found that regulatory takings claims required "ad hoc, factual inquiries" that included a balancing of the public and private interests involved in the particular case. *Lingle*, 125 S.Ct. at 2081-82. Under *Penn Central*, the factors to be considered include (1) the economic impact of the regulation, (2) the degree to which the regulation has interfered with the owner's reasonable "distinct investment-backed" expectations concerning the property, and (3) the character of the regulatory action. 438

---

[10]The government effects a physical taking when it physically occupies the land, obtains title to the land, or requires the landowner to submit to the physical occupation of the land by others. *Yee v. Escondido*, 503 U.S. 519, 527, 112 S. Ct. 1522, 1528 (1992). This includes such acts as flooding the property and requiring the landowner to suffer the installation of cable or similar intrusions. *Id.*

U.S. at 124-25, 98 S. Ct. at 2659-60; *see also Tahoe-Sierra Preservation Council, Inc.* 535 U.S. at 326-27, 122 S. Ct. at 1481.

Where the claim is based on detrimental economic impact that does not destroy all beneficial economic use,[11] the *Penn Central* analysis will be applied in a fact specific inquiry. *Tahoe-Sierra Preservation Council, Inc.*, 535 U.S. at 327, 122 S. Ct. at 1481; *Palazzolo*, 533 U.S. at 617, 121 S. Ct. at 2457; *see also Legal Foundation of Washington*, 538 U.S. at 234, 123 S. Ct. at 1418.[12]

Until very recently, another analysis was applied where the claim was based primarily on the government's conduct rather than the impact of that conduct on the value of the property. Two years after *Penn Central*, the Court held that "application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, or denies an owner economically viable use of his land." *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S. Ct. 2138, 2141 (1980)(involving a facial challenge to a regulation). Since *Agins*, the quoted statement has been frequently used as the beginning point for analysis of a takings claim. *See, e.g.*, *Loreto Dev. Co., Inc. v. Village of Chardon*, 149 F.3d 1183 (6th Cir. 1998); *Dodd v. Hood River County*, 136 F.3d 1219, 1228 (9th Cir. 1998) *cert. denied*, 525 U.S. 923, 119 S.Ct. 278 (1998) (holding that the Supreme Court's rulings require courts to first consider whether the regulation in question substantially advances a legitimate state interest, and if it does not, to hold the regulation invalid.); *Greater Atlanta Homebuilders Association v. DeKalb County*, 588 S.E.2d 694, 696-97 (Ga. 2003) (involving a facial challenge to an ordinance).

---

[11]Even where the allegation is a decrease in property's value, the *Penn Central* analysis will not always be applied. If a governmental regulatory action eliminates all economic value from a piece of property by prohibiting all economically beneficial use, then a "per se" taking has occurred, and such "total regulatory takings" must be compensated unless the government can show that the proscribed uses were not part of the owner's interests under state property and nuisance law. *Lucas*, 505 U.S. at 1019, 112 S. Ct. at 2895 (holding that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking.")

[12]The Court has specifically acknowledged that governments may, in the exercise of their police powers, affect property values by land use regulation without incurring an obligation to compensate. *Lucas*, 505 U.S. at 1023, 112 S.Ct. at 2897. Just how much of a diminution in value short of destruction of all value, *i.e.* a per se taking, is required to constitute a compensable taking is not clear, and the Supreme Court has repeatedly stated that there is no "set formula" for making that determination. *See, e.g.*, *Apfel*, 524 U.S. at 523, 118 S. Ct. at 2145; *Lucas*, 480 U.S. at 1015, 112 S.Ct. at 2893; *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. A regulation or regulatory action that affects a property's value does not constitute a taking unless it "destroys a major portion of the property's value." *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 329, 107 S.Ct. 2378, 2393 (1987) (Stevens, J. dissenting). Mere diminution in value, even where significant, is insufficient to establish a taking. *Concrete Pipe and Prods. of Cal. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645, 113 S. Ct. 2264, 2292 (1993). *See also Lucas*, 505 U.S. at 1016 n.7, 1019 n.8, 112 S. Ct. 2894 n.7, 2895 n.8 (discussing levels of interference resulting in loss of ninety and ninety-five percent of value.); *Maritrans, Inc. v. United States*, 51 Fed. Cl. 277, 283 (2001), *aff'd*. 342 F.3d 1344 (Fed. Cir. 2003) ("Several Supreme Court decisions suggest that diminutions in value approaching 85 to 90 percent do not necessarily establish a taking.")

For a number of years, the connection between the government's action and its legitimate public interests was considered as providing, at least in theory, a separate basis for a takings claim. *See Keystone Bituminous Coal Assoc. v. De Benedictis*, 480 U.S. 470, 485, 107 S.Ct. 1232, 1241-42 (1987) (reaffirming the *Agins* test); *Nollan v. California Coastal Commission*, 483 U.S. 825, 834, 107 S.Ct. 3141, 3147 (1987) (stating that the Supreme Court had "long recognized" that a land-use regulation was subject to a takings challenge on the ground it did not substantially advance legitimate governmental interests); *Dolan*, 512 U.S. at 385-86, 114 S.Ct. at 2316-17 (reaffirming the *Agins* test and stating that the first question to be determined was whether there existed the "essential nexus" between the legitimate state interest asserted and the permit conditions that had been exacted by the city); *Yee*, 503 U.S. at 530, 112 S.Ct. at 1530 ( stating that the effect of the rent control ordinance at issue might have some bearing were the case brought as a regulatory takings claim since it could "shed some light on whether there is a sufficient nexus between the effect of the ordinance and the objectives it is supposed to advance.") *See also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 704, 119 S.Ct. 1624, 1634-36 (1999),[13] (declining to revisit prior precedents on the law of regulatory takings and applying the *Agins* test to jury instructions); *Tahoe-Sierra Preservation Council*, 535 U.S. at 334, 122 S.Ct. at 1485 (listing the possible theories under which fairness and justice could support a conclusion that the governmental actions therein were takings, including a suggestion that the petitioners could have argued that those actions "did not substantially advance a legitimate state interest").

However, the Supreme Court very recently "corrected course" and clearly renounced or abandoned the "substantially advances" test as a stand-alone regulatory takings test, finding it was "not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation." *Lingle*, 125 S.Ct. at 2085. The Court noted that the "substantially advances" test derived from due process concepts and was logical in that context since it probed the validity of a land use regulation and suggested a means-end analysis. *Id*. at 2083-84.[14]

Because Consolidated has not appealed the dismissal of its takings claims, we need not explore further the many distinctions, exceptions, and emanations of these general principles. This explanation was required by the arguments made in this appeal based on the relationship of various challenges to a zoning ordinance.

----

[13]Some commentators had expressed doubt as to whether *Agins* created a separate test for determining whether a taking has occurred and as to whether that test survived later decisions by the Court. *See* R.S. Radford, "Of Course A Land Use Regulation That Fails to Substantially Advance Legitimate State Interests Results In a Regulatory Taking," 15 Fordham Envtl. L. Rev. 353 (Spring 2004) (discussing that position and the opposite).

[14]Some commentators had suggested that challenges to an ordinance on the basis it does not substantially advance legitimate public interests are more properly brought and analyzed as a substantive due process claim than under the Takings Clause. *See, e.g., John D. Echeverria, Takings and Errors*, 51 Ala. L. Rev. 1047, 1073-76 and 1080-86 (2000).

## B.  TENNESSEE HOLDINGS

The Tennessee Constitution in Article I, § 8 provides that "no man shall be . . . deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land." Article I, § 21 provides that "no man's particular services shall be demanded, or property taken, or applied to public use, without the consent of his representatives or without just compensation being made therefor." These provisions apply to governmental taking of property. *Barge v. Sadler*, 70 S.W.3d 683, 687 at n.4 (Tenn. 2002); *Far Tower Sites, LLC v. Knox County*, 126 S.W.3d 52, 69 (Tenn. Ct. App. 2003); *Cross v. McCurry*, 859 S.W.2d 349, 353 (Tenn. Ct. App. 1993).

Article I, § 21, the Tennessee Takings Clause, has been interpreted as recognizing the right of eminent domain, but also as a limitation on that right "by entirely prohibiting the taking of private property for private purposes, and by requiring just compensation when private property is taken for a public use." *Jackson v. Metropolitan Knoxville Airport Authority*, 922 S.W.2d 860, 861 (Tenn. 1996).[15] The Tennessee legislature has implemented this constitutional provision through adoption of eminent domain and inverse condemnation statutes. *Edwards v. Hallsdale-Powell Utility District*, 115 S.W.3d 461, 464 (Tenn. 2003); *Jackson*, 922 S.W.2d at 861. Both statutory procedures are methods by which a landowner can enforce the right to just compensation. Inverse condemnation "is a shorthand description of the manner in which a landowner recovers just compensation for a taking of property when condemnation proceedings have not been instituted." *Jackson*, 922 S.W.2d at 861-62.

The Tennessee Supreme Court has not yet applied the takings clause of the Tennessee Constitution to zoning or land use regulation. In fact, in older opinions, the Court adamantly refused to apply the takings clause to the consequence of legislative enactments.

In *Jackson v. Bell*, 143 Tenn. 452, 226 S.W.207 (1920), the plaintiff challenged a statute authorizing the fire prevention commissioner to order the repair or demolition of premises "especially liable to fire" as violative of Article I, section 21 of the Tennessee Constitution because it authorized the taking of his property without his consent and without compensation. The Court held, "That the sections of the Constitution relied on by the petitioner do not apply to the taking of services or property when the state is proceeding under its police power is declared in many of our cases." 226 S.W. at 210 (citations omitted). The court noted that the plaintiff "argues the case as though his property was being taken under the power of eminent domain." 226 S.W. at 209. Clearly, the Court found a distinction between a taking of property and the loss of property value as a result of legislative action in furtherance of the police power.

---

[15]Thus, under the Tennessee Constitution, a governmental taking for private purposes is unconstitutional. *Barge*, 70 S.W.3d at 687 at n.4; *Cross*, 859 S.W.2d at 353. The same view is taken of the Takings Clause of the United States Constitution: it affirms the government's authority to confiscate private property, but imposes two conditions: the taking must be for a public purpose, and just compensation must be paid. *Legal Foundation of Washington*, 538 U.S. at 231-32, 123 S.Ct. at 1417.

Similarly, in *Spencer-Strula Co. v. City of Memphis*, *supra*, the plaintiff asserted that a zoning ordinance violated the takings clause of the Tennessee Constitution because "the limitations, restrictions, and prohibitions placed upon the legal use of property is just as much a 'taking' and an application to a public use as if physically taken and appropriated." 290 S.W. at 611. The Tennessee Supreme Court disagreed, stating that the authorizing statute and the zoning ordinance were adopted in the exercise of the police power.

> This being true, the validity of the statute is not to be tested according to the provisions of section 21 of article 1 of the Constitution of Tennessee, for an exercise of the police power, otherwise valid and constitutional, cannot be defeated because property rights are taken or destroyed thereby without compensation.

290 S.W. at 611.[16]

The same reasoning was applied by the Tennessee Supreme Court in a much later case, *Draper v. Haynes*, 567 S.W.2d 462 (Tenn. 1978), wherein an ordinance regarding roads in subdivisions was challenged on several constitutional bases, including that it represented a taking of property without compensation in violation of Article I, § 21 of the Tennessee Constitution. The Court held:

> Ordinances regulating the use and development of property are generally held to lie within the police power of municipal corporations, and their adoption, while frequently affecting property values and restricting use of property, has generally not been considered to amount to a taking under the power of eminent domain . . .

567 S.W.2d at 465 (citations omitted). *See also City of Clarksville v. Moore*, 688 S.W.2d 428, 430 (Tenn. 1985) (city's order for removal of abandoned car was not a taking for public or private use, and ordinance was an exercise of police power).

In later opinions, the Tennessee Supreme Court has on several occasions described a "taking," most recently stating that "[a] 'taking' of real property occurs when a governmental defendant with the power of eminent domain performs an authorized action that 'destroys, interrupts, or interferes with the common and necessary use of real property of another.'" *Edwards*, 115 S.W.3d at 465, quoting *Pleasant View Utility Dist. v. Vradenburg*, 545 S.W.2d 733, 735 (Tenn. 1977).

_____

[16]The Court found that the "serious question" involved in the appeal was whether the abridgement of property rights authorized by the statute was properly within the police power of the state. 290 S.W. at 611. The Court held that the legislature may impose any limitation upon the use of property that it deems necessary or expedient to promote the safety, health and welfare of the people, provided that there was a reasonable connection or relation between the limitation and the public health, safety, or welfare (the rational basis test). 290 S.W. at 612. "Having reached the conclusion that the statute is a valid exercise of the police power, under the Constitution of Tennessee, it necessarily results that we overrule the further contention of the plaintiff in error that the statute is in violation of the first section of the Fourteenth Amendment of the United States." 290 S.W. at 613.

In *Edwards*, the Court stated that Tennessee courts have recognized two classifications of takings: physical occupation takings and nuisance-type takings.[17] 115 S.W.3d at 465. Regulatory takings, as that term is used in cases under the federal Takings Clause, do not obviously fall into either of these classifications. Based on existing precedent, we cannot say that the Tennessee Supreme Court has adopted a regulatory takings doctrine under the Tennessee Constitution similar to that developed by the United States Supreme Court under the United States Constitution. Instead, the court has traditionally examined land use regulation through ordinances using the rational basis test, as set out earlier in this opinion, or other tests of validity under state law.

The Tennessee Court of Appeals has generally followed the analysis established by the Supreme Court in the early takings opinions. In *Copeland v. City of Chattanooga*, 866 S.W.2d 565 (Tenn. Ct. App. 1993), the developer claimed a condition of the re-zoning of his property that he dedicate a portion to the city for a right of way was an unconstitutional taking. This court framed the issue as whether the conditional zoning was a proper exercise of governmental power and applied the traditional standard for judicial review of zoning actions. 866 S.W.2d at 566-67. *See also Mobile Home City of Chattanooga*, 552 S.W.2d at 89 (finding that the zoning ordinance restricted landowners' use of their property without compensating them, but stating, "this however is not the test, because the same can be said of any zoning regulation.")

In *Bayside Warehouse Company v. City of Memphis*, 470 S.W.2d 375 (Tenn. Ct. App. 1971), this court acknowledged that the judiciary will not substitute its judgment for that of a legislative body in zoning decisions, but held that "where the regulation goes so far as to deprive the owner of the beneficial use of his property, then the regulation becomes confiscatory and gives rise to judicial review." 470 S.W.2d at 378. In that case, the re-zoning denied the owner of any beneficial uses, and

---

[17] Physical occupation takings arise when a governmental defendant causes either a direct and continuing physical invasion of private property or a destruction of a plaintiff's property rights. . . . We have held that such direct and physical invasions constitute a governmental taking when real property is either actually appropriated or the common and necessary use of the property is rendered impossible or seriously interrupted. Physical occupation takings may also arise when a governmental defendant causes a destruction of a plaintiff's property rights. . . . This type of physical occupation constitutes a taking when there is a diminution in the value of real property peculiarly affected and directly invaded that is not shared by the public at large.

[A nuisance-type] taking occurs when the governmental defendant interferes with a landowner's beneficial use and enjoyment of the property. . . . In *Jackson*, we established the standard for determining whether a nuisance-type taking has occurred: the plaintiff must allege a direct and substantial interference with the beneficial use and enjoyment of the property; this interference must be repeated and not just occasional; the interference must peculiarly affect the property in a manner different than the effect of the interference to the public at large; and the interference must result in a loss of market value.

*Edwards*, 115 S.W.3d at 465 (citations omitted).

16

the court held that where, as in that situation, "the regulation goes too far it will be recognized as a taking." *Id.* This court upheld the trial court's determination that the re-zoning was arbitrary and unlawful, and the trial court's striking down of the ordinance under the common law *writ of certiorari* standard. Thus, although the court used regulatory takings language in part of the opinion, it applied the traditional standard for review of administrative decisions.

In other opinions, the Court of Appeals has appeared to recognize a takings claim, but has not actually found a taking. *See The Rogers Group, Inc. v. Anderson County*, 113 S.W.3d 725, 726 (Tenn. Ct. App. 2003) (although the issue addressed in the opinion was a procedural one, the court noted that the case involved a claim for damages for an unconstitutional taking of the plaintiff's property by zoning classification); *see also Far Tower Sites, LLC*, 126 S.W.3d at 69 (Tenn. Ct. App. 2003) (holding that because plaintiff had no vested property interest, it could not pursue a takings claim based on changes in setback requirements); *Vowell Ventures v. City of Martin*, 47 S.W.3d 434, 437 (Tenn. Ct. App. 2000) (holding that plaintiff's action for inverse condemnation and unconstitutional taking due to denial of building permit were time barred, but noting that application of valid zoning ordinances does not constitute a taking without just compensation); *MC Properties, Inc. v. City of Chattanooga*, 994 S.W.2d 132, 136 (Tenn. Ct. App. 1999) (holding that a refusal to rezone did not deprive landowner of beneficial use of the property and, therefore, there was no basis to hold that there had been an unconstitutional taking); *Knox Loudon Corporation v. Town of Farragut*, No. E2000-00174-COA-R3-CV, 2000 WL 775077, at *4 (Tenn. Ct. App. June 16, 2000), perm. app. denied (Jan. 2, 2001) (stating that if the initial plans for improvements had met all the zoning requirements, which they did not, the local government's requirement for dedication of the property would have been a taking).

### C. OTHER FEDERAL COURT REQUIREMENTS FOR A TAKINGS CLAIM

The regulatory takings analysis has been applied only to discrete, specific interests in property. *See Apfel*, 524 U.S. at 541, 118 S.Ct. at 2155 (Kennedy, J. concurring in judgment and dissenting in part) and at 553-55, 118 S.Ct. at 2161-62 (Breyer, J., dissenting). Generalized economic interests are not protected by the Takings Clause. *Id.* State law defines the scope of property rights and, thus, is critical in determining whether a specific right is entitled to the protection of the Takings Clause. *See Lucas*, 505 U.S. at 1029, 112 S.Ct. at 2900 (holding, in a case involving real property, that generally property rights will be defined by reference to "the restrictions that the background principles of the State's law of property and nuisance already place upon land ownership"); *Ruckelshaus v. Monsanto Company*, 467 U.S. 986, 1010-13, 104 S.Ct. 2862, 2877-79 (1984) (relying on state law to determine whether trade secrets are a property right protected under the Takings Clause).

In Tennessee, to pursue a claim for unconstitutional taking, whether based on physical occupancy or regulatory action, a plaintiff must have a vested interest or right in the property. *See Far Tower Sites, LLC*, 126 S.W.3d at 66-69. The trial court herein determined that Consolidated lacked a sufficient interest in the property to have standing to bring a takings claim. Consolidated does not appeal that holding.

17

In addition, the United States Supreme Court has adopted procedural requirements that restrict federal court review of regulatory takings claims against local governments. Relevant to the case before us are ripeness requirements. A takings claim based on the U.S. Constitution is not ripe for review by federal courts until (1) the regulatory entity has rendered a "final decision" on the matter and (2) the plaintiff has sought just compensation by means of an available state procedure. *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. at 194, 105 S.Ct. at 3120 (1985).

The second requirement is based upon the principle that the Fifth Amendment's Takings Clause protects against a governmental taking without just compensation. Until a landowner has pursued available methods for obtaining compensation, no Takings Clause injury has occurred.[18] 473 U.S. at 195, 105 S.Ct. at 3122. Because the Fifth Amendment protects only governmental takings without just compensation, there has long been a requirement that a plaintiff bringing a taking claim show that he or she has been denied just compensation. *Ruckelshaus*, 467 U.S. at 1013-14, 104 S.Ct. at 2878.

The other ripeness requirement is based upon the premise that unless the landowner sought a variance, he or she had not received a "final answer" as to the application of the land use regulation to his property. If the landowner sought and was granted a variance, there would be no need for federal courts to "address the difficult and vexing questions associated with regulatory takings." *Montgomery v. Carter County*, 226 F.3d 758, 764 (6th Cir. 2000).

In other words, a court cannot determine that a regulation or regulatory action "goes too far" unless it knows exactly how far the regulation reaches. *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348, 106 S.Ct. 2561, 2566 (1986). Because of the factors to be considered under *Penn Central* in a regulatory takings analysis, where that analysis is the appropriate one to apply, the court needs to know the type, intensity, or level of development allowed on the property.

> Our reluctance to examine takings claims until such final decision has been made is compelled by the very nature of the inquiry required by the Just Compensation Clause . . . among the factors of particular significance in the [takings] inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. . . . Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

*Williamson County*, 473 U.S. at 190-91, 105 S.Ct. at 3118-19.

---

[18]In *Williamson County*, the Court found that Tennessee had an adequate procedure for pursuing just compensation through an inverse condemnation proceeding. Consequently, the landowner was required to pursue those remedies before bringing a Takings Clause action in federal court. 473 U.S. at 196, 105 S.Ct. at 3121-22.

## VI. PRE-EMPTION OF SUBSTANTIVE DUE PROCESS CLAIM

The Metropolitan Government's argument that Consolidated could not bring a substantive due process claim is based upon the principle announced in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865 (1989), that where another provision of the United States Constitution provides an explicit source of protection from the conduct complained of, the "more generalized notion" of substantive due process should not be used to analyze the claims. 490 U.S. at 395, 109 S.Ct. at 1871.[19] Essentially, the Court believed that the protection offered by substantive due process was "at best redundant" if another provision offered explicit protection of the same right. 490 U.S. at 395, n.10, 109 S.Ct. at 1871 n.10.

The Supreme Court has since noted that *Graham* applies "if a constitutional claim is covered by a specific constitutional provision." *United States v. Lanier*, 520 U.S. 259, 272 n.7, 117 S.Ct. 1219, 1228 n.7 (1997). If a substantive due process claim is not otherwise covered by another, more specific provision, it is to be analyzed using traditional substantive due process standards. *See County of Sacramento*, 523 U.S. at 842-44, 118 S.Ct. at 1708, 1715-16 (analyzing an excessive force claim that did not involve a seizure or a search using substantive due process standards). The purpose behind the rule adopted in *Graham* is to avoid expanding the concept of substantive due process where protection from the challenged governmental action is provided by a more specific provision of the Constitution.[20] *County of Sacramento*, 523 at 842, 118 S.Ct. at 1714. Essentially, "to the extent there is duplication, the more explicit textual source of constitutional protection is to be used to assess the validity of the challenged action." *John Corp. v. City of Houston*, 214 F.3d 573, 582 (5th Cir. 2000).

Some federal circuit courts have applied the *Graham* principle to claims of unconstitutional taking and violation of substantive due process. In particular, the Ninth Circuit has held that because the Takings Clause provides an explicit textual source of constitutional protection, that clause, rather than substantive due process, must provide the analytical framework for claims based on governmental action impacting real property. *Armendariz v. Penman*, 75 F.3d 1311, 1324 (9th Cir. 1996).[21]

In *Armendariz*, the owners of low income housing claimed that the over enforcement (through sweeps and closure of buildings) of the housing code caused them to lose their property

---

[19]*Graham* involved a claim of excessive force by police against a free citizen and the Supreme Court held such claims must be analyzed under the Fourth Amendment's "objective reasonableness standard" rather than some generalized standard under substantive due process. 490 U.S. at 394, 109 S.Ct. at 1871.

[20]"[T]he Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decision making in this unchartered area are scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068 (1992).

[21]A number of treatises and courts have classified or categorized the circuits according to their position on this issue at the time of the article or opinion was written. *See*, *e.g.*, Robert Ashbrook, Land Development, the Graham Doctrine, and the Extinction of Economic Substantive Due Process, 150 U. Pa. L. Rev. 1255, 1265-76 (April 2002);

through foreclosure so that the land could be obtained and developed by a shopping center developer for private gain. The owners claimed that the government's actions violated substantive due process. They did not explicitly bring a takings claim, but implied that the governmental action was taken to allow private use of the land. The court interpreted this aspect as a private taking claim. The court then held that "the Takings Clause 'provides an explicit textual source of constitutional protection' against 'private takings,'" *Id.* at 1324.

The Ninth Circuit consequently held that the plaintiffs' substantive due process claim would not stand and that *Graham* provided an insurmountable hurdle to plaintiffs' substantive due process claim. 75 F.3d at 1324. Noting that substantive due process analysis has no place in contexts already addressed by explicit Constitutional protections, the court held that "even if the City's alleged conduct was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare, the plaintiffs' substantive due process claim fails because it is preempted by other constitutional claims." *Id.* at 1318.

The Ninth Circuit has continued to apply *Armendariz.* In *Macri v. King County*, 126 F.3d 1125 (9th Cir. 1997), *cert. denied*, 522 U.S. 1153, 118 S.Ct. 1178 (1998) the plaintiffs claimed that the county denied the plaintiffs' plat application for subdivision without substantially advancing a legitimate public purpose and under circumstances that denied them any beneficial use of the property. The plaintiffs attempted to classify their claim as solely one based on substantive due process, arguing that an assertion that a government's action failed to advance a legitimate state interest should be analyzed under due process standards, regardless of whether the action at issue involved real property. The Ninth Circuit rejected that argument, noting that the Supreme Court has repeatedly recognized that "a land use restriction that does not substantially advance legitimate state interests or denies an owner economically viable use of his land effects a taking" (the *Agins* test). 126 F.3d at 1129. Consequently, the court affirmed the dismissal of the plaintiffs' substantive due process claim and analyzed the case under the Takings Clause and its ripeness requirements. *See also Buckles v. King County*, 191 F.3d 1127, 1137 (9th Cir. 1999) (holding that plaintiffs were precluded from asserting a substantive due process claim "instead of, or in addition to, a takings claim" where plaintiffs challenged a rezoning of their property on various grounds); *Weinberg v. Whatcom County*, 241 F.3d 746, 749 n.1 (9th Cir. 2001) (dismissing substantive due process claim because it was subsumed into also filed takings claim); *Esplanade Properties, L.L.C. v. City of Seattle*, 307 F.3d 978, 983 (9th Cir. 2002) *cert. denied*, 539 U.S. 926, 123 S.Ct. 2574 (affirming dismissal of substantive due process claim where plaintiffs claimed that city's denial of permits to develop shoreline property resulted in complete deprivation of economic use of property, constituting both a taking and a denial of substantive due process); *Chevron USA, Inc v. Bronster*, 363 F.3d 846, 853 (9th Cir. 2004) cert. granted *Lingle v. Chevron U.S.A., Inc.*, 125 S.Ct. 314 (Oct. 12, 2004) ("The Takings Clause supercedes any substantive due process challenges when a law is challenged as a regulatory taking.").

Whether or not the plaintiff actually alleges a violation of the Takings Clause is not dispositive of the preclusion issue under the Ninth Circuit's approach. *Armendariz*, 75 F.3d at 1324 n.9. Nor is the plaintiff's characterization of the claim. The test appears to be whether the claim

challenges the same conduct as a takings claim, *Armendariz*, 75 F.3d at 1324 n.9, or whether the claims allege "governmental interference with property rights."[22]  *Madison v. Graham*, 316 F.3d 867, 870 (9th Cir. 2002).  In *Madison*, the plaintiffs alleged that a state statute allowing public use of all waters capable of recreational use unconstitutionally violated their substantive due process rights.  The plaintiffs "strenuously protest[ed] construction of their complaint as a takings claim."  Nonetheless, the Ninth Circuit found that the actual harm alleged by the plaintiffs was their inability, due to the statute, to exclude others from their property.  Because the right of landowners to exclude others is an essential private property right, the Court found that the alleged harms were addressed by the Takings Clause and that plaintiffs' claim must be analyzed as a takings claim.  *Id.* 316 F.3d at 870-71.  The court also rejected the plaintiffs' argument that because they sought only declaratory and injunctive relief, not damages or compensation, their complaint could not be interpreted as a takings claim, stating that landowners are allowed to seek such equitable relief in order to resist takings that threaten to violate the Constitution.  *Id.*  The court affirmed dismissal of the complaint but did not consider the merits of a takings claim, presumably because the plaintiffs did not plead, and specifically denied making, such a claim.

Not all circuits have reached the same conclusion as the Ninth Circuit.[23]  *See*, *e.g.*, *Tri County Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997) ("[T]he requirements of the takings clause cannot be said to exhaust the Fifth Amendment's substantive protection of property rights from government imposition.")  Some have simply continued to analyze the different challenges separately without discussion of any *Graham* issue or implication.  For example, the Eleventh Circuit, although clarifying and distilling its appraoch to the types of clams that can be brought, has continued to analyze each claim actually brought separately.  *See Villas of Lake Jackson, Ltd.*, 121 F.3d 610 (determining that there is no independent "substantive due process taking" cause of action and separately analyzing the plaintiff's takings, substantive due process, and equal protection claims); *Restigouche, Inc.*, 59 F.3d at 1211-12 (discussing the different types of Constitutional challenges, distinguishing the requirements for each type, and examining each one present in that case), citing *Eide v. Sarasota County*, 908 F.2d 716 (11th Cir. 1990), *cert. denied*, 498 U.S. 1120 (1991) (discussing four types of constitutional challenges to a zoning decision and separately examining the ones presented).

Other circuits continue to develop their positions on the issue.  For example, in *South County Sand & Gravel Co., Inc. v. Town of South Kingstown*, 160 F.3d 834, 835 (1st Cir. 1998), the First Circuit recognized a shift in the "legal terrain" since its earlier holding in *Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield*, 907 F.2d 239, 242 (1st Cir. 1990), wherein it had

---

[22]In *Armendariz*, the Court explained that the fact that a takings claim is rejected or dismissed does not allow the substantive due process claim.  ". . . *Graham* does not stand for the proposition that a plaintiff may bring a substantive due process claim whenever his potential claims under more specific provisions of the Bill of Rights fail. . . ."  75 F.3d at 1325.

[23]Courts in this state treat decisions of federal district and circuit courts as persuasive, but not controlling authority with regard to the interpretation of the United States Constitution.  *State v. Carruthers*, 35 S.W.3d 516, 561 n. 45 (Tenn. 2000).

21

allowed an "abstract" challenge to an allegedly irrational zoning provision on substantive due process grounds. The shift was the preference of many courts to analyze such claims under takings, rather than substantive due process, standards. However, the court concluded, "Withal, there is no need to submit to a tyranny of labels." The court reasoned that the distinction between the two types of analysis was, in the circumstances of the case before it, largely a matter of semantics. 160 F.3d at 836. Noting that the Supreme Court's takings jurisprudence continued to rely on earlier cases establishing the substantial relation test, the court found that approach consistent with the rational basis test applied in *Smithfield Concerned Citizens* to a facial challenge to a zoning ordinance. "Thus, although the substantive limits of the Takings Clause may not necessarily coincide with the substantive limits of the Due Process Clause in every imaginable context, . . . the limits are congruent in this instance." *Id*. The court then analyzed the claims under the rational basis test.

Some circuits have specifically declined to follow the Ninth Circuit's approach. In *John Corp. v. City of Houston*, 214 F.3d 573 (5th Cir. 2000), the Fifth Circuit held that the principles of *Graham* did not mean that the applicability of a more explicit provision pre-empts the protection of the due process clause. *Id*. at 582. After a thorough review of the circuits on the issue, including the Ninth Circuit's cases, the court declined to adopt a blanket rule that the Takings Clause subsumes any substantive due process claim relating to a deprivation of property, finding such a rule inconsistent with the Fifth Circuit's precedents and with the approach taken by a majority of other circuits. *Id*. at 583. Instead, the court determined that each case required a "careful analysis . . . to assess the extent to which a plaintiff's substantive due process claim rests on protections that are also afforded by the Takings Clause. . . ." *Id.*

The Fifth Circuit later described *John Corp*. as holding that substantive due process claims alleging deprivations of property are not necessarily subsumed under the Takings Clause, that substantive due process claims can survive a related takings argument, and that the court must analyze whether a takings analysis exhausts all the constitutional claims. *Simi Investment Co., Inc. v. Harris County*, 236 F.3d 240, 247-49 (5th Cir. 2000), *cert. denied*, *Harris County v. Simi Investment Co., Inc.*, 534 U.S. 1022, 122 S.Ct. 550 (2001). In both *John Corp*. and *Simi Investment*, the court examined each of the claims propounded by the plaintiff. In *John Corp.*, the court determined that the complaint included only one due process claim that was not a taking claim, and, therefore, unaffected by *Graham*. That claim was that the demolition of plaintiff's property was carried out under an ordinance that was unconstitutionally vague. The court also found that the plaintiff's equal protection claim asserted rights not protected by the Takings Clause and, therefore, was not amenable to treatment as a takings claim under *Graham*. *John Corp.*, 214 F.3d at 585.

Likewise, in *Simi Investment*, the court determined that the plaintiff's allegation of an arbitrary and illegitimate governmental attempt to interfere with private property rights was a substantive due process claim to be analyzed under traditional standards for such claims, not under the Takings Clause. *Simi Investment Co., Inc.*, 236 F.3d at 249. *See also Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387-88 (5th Cir. 2001) (analyzing, without reference to *Graham*, plaintiff's claim that an ordinance was arbitrary and unreasonable and lacked a real and substantial relation to the goal of the city under substantive due process, where plaintiff brought federal and state

takings, substantive due process, procedural due process, and equal protection claims).

The Sixth Circuit has adopted a somewhat different approach to federal court review of local zoning actions. In *Pearson v. City of Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992), that court specifically reversed the lower court's holding that all federal zoning cases should be treated as takings claims, because that position could not be reconciled with current controlling precedent, 961 F.2d at 1213-14, and rejected the argument that "all arbitrary and capricious substantive due process claims are merged" into takings claims. 961 F.2d at 1216.

In that opinion, the court examined the different circuits' treatment of zoning cases with regard to ripeness requirements, due process standards, and other issues.[24] The court observed that some courts imposed a ripeness requirement in zoning cases, but explained that that requirement was only applicable to takings claims because federal courts cannot know what has been taken or what compensation has been afforded unless those requirements are met. The court also observed that some circuits imposed a less stringent ripeness requirement on non-taking zoning cases described as "as applied substantive due process claims." 961 F.2d 1215.

In *Berger v. City of Mayfield Heights*, 154 F.3d 621 (6th Cir. 1998), the plaintiff challenged, on various grounds including a takings claim, an ordinance requiring owners of small lots to cut their property to a maximum height. The court decided that the ordinance violated the Due Process Clause and the Equal Protection Clause because there was no rational relationship between the terms of the ordinance and a legitimate public purpose. *Id*. at 625-626. The court found the other claims, including the takings claim, to be without merit.

In *Richardson v. Township of Brady*, 218 F.3d 508 (6th Cir. 2000), the plaintiff challenged a zoning ordinance on the basis of substantive and procedural due process, equal protection, and takings. On appeal to the Sixth Circuit, he limited his claims to substantive and procedural due process, challenging the ordinance as violative of substantive due process both on its face and as applied to his property. The court considered each of these claims.

In *Montgomery v. Carter County*, 226 F.3d 758 (6th Cir. 2000), the Sixth Circuit considered the ripeness requirements of *Williamson County* in the context of an alleged taking for private, rather

---

[24]The Sixth Circuit distinguished the types of "federal zoning claims" as including: (1) just compensation takings claims wherein the remedy sought was compensation for zoning that constitutes a taking of property; (2) due process takings claims, where the plaintiff claims that the zoning applicable to his property goes too far and destroys its value so that it amounts to a taking and the remedy sought is invalidation of the zoning regulation; (3) arbitrary and capricious substantive due process claims, wherein the plaintiff claims that the zoning regulation is arbitrary and capricious in that it does not bear a substantial relation to the public health, safety, morals or general welfare, and which may be either an as-applied or facial challenge; (4) equal protection claims; (5) procedural due process claims; and, less frequently, (6) First Amendment violations by the zoning ordinance. 961 F.2d at 1215-16.

than public, purposes.[25]  In that opinion, however, the court discussed the plaintiff's claims that were based on constitutional violations in addition to her takings claim.  The court acknowledged that its own precedents, including *Pearson*, allowed the plaintiff to assert due process claims in addition to a takings claim.  226 F.3d at 768.  However, the court noted that "it is not clear why the concept of substantive due process should have any place in takings cases" and discussed, with apparent approval, the Ninth Circuit's position in *Armendariz*. 226 F.3d at 769.  Nonetheless, the court declined to decide whether the Takings Clause preempts or subsumes a more generalized substantive due process claim in a zoning or land use case.[26]   226 F.3d at 769-70.

The Sixth Circuit opinions since *Montgomery* require some discussion.  In some cases, the court continued to use the *Pearson* guidelines for analysis.  *See, e.g., Tri-Corp Management Company v. Praznik*, 33 Fed. Appx. 742 (6th Cir. 2002) (considering separately each of plaintiff's claims of denial of procedural due process, equal protection, substantive due process as well as compensatory and due process takings claims related to city zoning officials' issuance of stop work order and holding that only the substantive due process claim was viable). In other cases the court has applied the *Armendariz*-related dicta in *Montgomery* and stated that the plaintiff's substantive due process claim was subsumed by his taking claim, at least where the claims were essentially the same.  *See Buckles v. Columbus Municipal Airport Authority*, 90 Fed. Appx. 927, 931 (6th Cir. 2004) (holding that a substantive due process claim that merely restates a more specific takings claim will not lie); *Choate's Air Conditioning & Heating, Inc. v. Light, Gas and Water Division of the City of Memphis*, 16 Fed. Appx. 323, 330-31(6th Cir. 2001) (holding that the plaintiff had merely "repackaged a takings claim as a substantive due process violation" and dismissing that claim because it was not ripe).

*Banks v. City of Whitehall*, 344 F.3d 550 (6th Cir. 2003), involved a challenge to enforcement of local building and fire codes which the plaintiff claimed amounted to a taking and was also unconstitutionally selective.  The trial court held the takings and inverse condemnation claims were not ripe for review, and plaintiff did not appeal those holdings.  The determinative issue in the appeal was whether the lawsuit was filed outside the applicable statute of limitations, and the Sixth Circuit held it was.  Nonetheless, the court discussed the merits of the plaintiff's substantive due process claim.  *Id*. at 554-555.  Although the court noted that "the Fifth Amendment, and not substantive due process, is the basis upon which a plaintiff may challenge the government's actions with respect to his property," *Id*. at 554, it also separately considered the plaintiff's challenge to the conduct of local government officials, applying substantive due process standards.  *Id*. at 554-555.

---

[25]On that issue, the court held that the Takings Clause prohibits the government's taking of property for private use, and just compensation is not an adequate remedy as it is in a taking for a public purpose.  Consequently, the court held that a plaintiff who alleged a private taking was not required to meet the ripeness requirements.  226 F.3d at 767.

[26]The court stated, "whatever the applicability of the concepts of procedural and substantive due process to takings claims, we agree those concepts may not be used in order to mount an end run around the ripeness requirements of *Williamson County*."  226 F.3d at 769-770.

The United States Supreme Court has yet to apply *Graham* to preclude a substantive due process analysis when a takings claim is also plead or implicated. [27] It had the opportunity to do so in *Eastern Enterprises v. Apfel*, in which the Court considered the constitutionality of a federal statute that established a mechanism for funding benefits to coal industry retirees. The plaintiff, who under the statute would be required to contribute to the fund, sought declaratory and injunctive relief and asserted that the statute violated its substantive due process rights and also constituted a taking.

Four justices held that the act was unconstitutional because it violated the Takings Clause, but declined to address the plaintiff's due process claim. [28] 524 U.S. at 538, 118 S.Ct. at 2153. Justice Kennedy concurred in the result holding the statute unconstitutional, but found that the statute should be invalidated solely upon "essential due process principles, without regard to the Takings Clause of the Fifth Amendment." *Id.*, 524 at 539, 118 S.Ct. at 2154. The remaining four dissenting justices analyzed the claims under substantive due process and found no constitutional violation under that clause. [29]

As a result, five justices held the statute unconstitutional, but on different grounds. Five also used a due process analysis. For purposes of the pre-emption issue before us, the significance lies in the fact that five justices found a substantive due process analysis appropriate even though a takings claim had also been alleged. [30] None of the justices referred to or applied the principles of *Graham* to the question of which constitutional provision should be used.

---

[27]In *City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188, 123 S.Ct. 1389 (2003) the Court considered whether a city had violated the equal protection or substantive due process rights of developers of a multifamily, low-income housing complex when it submitted to popular referendum an ordinance repealing the council's approval of the project. The Court applied equal protection and substantive due process analyses and standards. 538 U.S. at 194-95, 123 S.Ct. at 1394-98. In a concurring opinion, Justice Scalia noted that those claiming arbitrary deprivations of nonfundamental liberty interests must look to the Equal Protection Clause and that *Graham v. Conn*or precludes the use of a substantive due process analysis when a more specific constitutional provision, *i.e.*, equal protection, governs. 538 U.S. at 200-01, 123 S.Ct. at 1397 (Scalia, J. concurring). Although the concurrence mentions the Takings Clause, it is in the context of explaining that that clause allows confiscation, with compensation, as well as regulation of land, thus demonstrating that land use issues do not implicate fundamental liberty interests. We do not read that concurrence as indicating that the Takings Clause supercedes substantive due process. *But see City of Whitehall*, 344 F.3d at 554 (indicating such an interpretation).

[28]The plurality opinion was authored by Justice O'Connor and joined in by Chief Justice Rehnquist and Justices Scalia and Thomas.

[29]In *Esplanade Properties, L.L.C.*, *supra*, the Ninth Circuit rejected an argument that the Supreme Court's decision in *Apfel* overturned *Armendariz*. 307 F.3d at 982-83.

[30]As to the Court's resolution of the substantive issues in *Apfel*, because no single rationale explaining the result was agreed upon by five justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . ." *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990 (1977). Federal courts examining *Apfel* have found that it did not articulate binding principles of law. *See Asarco Incorporated v. Dep't. of Ecology*, 43 P.3d 471, 475 n.9 (Wash. 2002) (listing those opinions).

25

Justice O'Connor, in the plurality opinion, stated that a Takings Clause analysis was correct because that clause had been used previously to examine similar economic legislation. Central to the that examination was the statute's severe retroactive effect. Justice O'Connor stated that the statute burdened former employers based on long past conduct and unrelated to any commitment they made or injury they caused and, therefore, "the governmental action implicates fundamental principles of fairness underlying the Takings Clause." U.S. at 537, 118 S.Ct. at 2153.

The plurality opinion recognized that the plaintiff had also claimed that the legislation violated substantive due process, but found it unnecessary to consider that claim in view of the determination that the legislation was invalid based on the Takings Clause analysis. Justice O'Connor noted that there was a question whether the Act at issue violated due process "in light of the Act's severely retroactive impact." Although the Justice reiterated the Court's concerns about using the Due Process Clause to invalidate economic legislation, the reason for declining to review the due process claim was that such review was unnecessary, not that it was precluded by *Graham* or other precedent. *Id.*, 524 U.S. at 537, 118 S.Ct. at 2153.

Justice Kennedy, however, took the position that the Act was invalid as "contrary to essential due process principles," and that the plurality's Takings Clause analysis was not only unnecessary for decision of the case, but also incorrect. 524 U.S. at 539, 118 S.Ct. at 2154.[31]

Justice Kennedy saw the plurality as adopting a "novel and expansive" concept of takings law. He noted that, traditionally, the Takings Clause has not been seen as a substantive or absolute limitation on the government's power, but rather as a conditional limitation that allows the government to do what it wants so long as it "pays the charge." 524 U.S. at 544-45, 118 S.Ct. at 2157. Because the constitutionality of the legislation at issue appeared to turn on the legitimacy of the substantive decision by Congress rather than on the availability of just compensation, Justice Kennedy concluded that the more appropriate analysis was under due process. 524 U.S. at 545, 118 S.Ct. at 2157.

Justice Breyer, in dissent, framed the question as whether the legislation placed a burden on the plaintiff that was fundamentally unfair. 524 U.S. at 553, 118 S.Ct. at 2161. He, along with the other three justices joining in his dissent,[32] agreed with Justice Kennedy that the plurality viewed the case "through the wrong legal lens." 524 U.S. at 554, 118 S.Ct. at 2161. Their dissent maintained

---

[31]His primary objection was that the legislation in question did not take the plaintiff's property but simply imposed an obligation to perform an act, *i.e.*, payment of benefits. Additionally, he objected to the plurality's abandonment or disregard, in his view, of the previously established requirement for a regulatory takings claim that the regulation or governmental conduct affect a specific property right or interest. *Id.*, 524 U.S. at 540-42, 118 S.Ct. at 2154-55. "As the range of governmental conduct subjected to takings analysis has expanded, however, we have been careful not to lose sight of the importance of identifying the property allegedly taken, lest all governmental action be subjected to examination under the constitutional prohibition against taking without just compensation, with the attendant potential for money damages." *Apfel*, 524 U.S. at 543, 118 S.Ct. at 2156 (Kennedy, J. concurring in the judgment and dissenting in part).

[32]Joining in this dissent were Justices Stevens, Souter, and Ginsberg.

that the Takings Clause is concerned with providing compensation for legitimate government action that takes private property, not with preventing arbitrary or unfair government action. 524 U.S. at 554, 118 S.Ct. at 2161.[33]

The four justices in dissent found, based on the history of promises and labor practices in the past, it was not fundamentally unfair for Congress to impose upon the former employer liability for future health care costs of miners it employed years ago. 524 U.S. at 566, 118 S.Ct. at 2167.

Although various members of the Court differed on which provision of the United States Constitution should apply to their review of the statute, none suggested that the Takings Clause pre-empted the Due Process Clause. For example, Justice Stevens, in dissent, concluded that "whether the provision in question is analyzed under the Takings Clause or the Due Process Clause," the plaintiff had not overcome the presumption of constitutionality accorded to the legislation. 524 U.S. at 553, 118 S.Ct. at 2161. No mention was made of *Graham*, although the same conduct (adoption of the Coal Act and its application to former employers) was the factual basis for both types of claims.

We are persuaded that the United States Supreme Court has not adopted a position that substantive due process claims related to a zoning ordinance are always subsumed into a takings claim.[34] The Court's recent decision in *Lingle* solidifies our conclusion because the Court rejected the "substantially advances" test as part of a regulatory takings analysis and made it clear that the validity of a zoning ordinance as an exercise of the government's police power is to be tested under traditional due process rational basis principles. "We conclude that this formula [the 'substantially advances' formula] prescribes an inquiry in the nature of a due process, not a takings, test, and that it has no proper place in our takings jurisprudence." *Lingle*, 125 S.Ct. at 2083. After explaining the historical basis for the "commingling" in *Agins* of due process and takings inquiries, the Court made it clear that the analytical underpinnings of the claims were different:

---

[33]Additionally, Justice Breyer stated that the Takings Clause had always focused on a whether the government had invaded or appropriated a specific interest in physical or intellectual property. The statute at issue in *Apfel*, he maintained, involved no such interest, but only an ordinary liability to pay money to a third party. 524 U.S. at 554, 118 S.Ct. at 2162. Seeing no need to "torture" the Takings Clause to fit the facts of the case contrary to prior interpretation, Justice Breyer found that the question of whether the statute's creation of retroactive liability was unfair should find "a natural home in the Due Process Clause." 524 U.S. at 556, 118 S.Ct. at 2163.

[34]In addition to the Court's treatment of due process and takings in *Apfel*, the Court has also stated that "Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. Where such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character. Rather , we examine each constitutional provision in turn." *Soldal v. Cook County, Ill.*, 506 U.S. 56,70, 113 S.Ct. 538, 548 (1992). *See also United States v. James Daniel Good Real Property*, 510 U.S. 43, 49, 114 S.Ct. 492, 499 (1993) ("We have rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another.")

The "substantially advances" formula suggests a means-end test: It asks, in essence, whether a regulation of private property is effective in achieving some legitimate public purpose.  An inquiry of this nature has some logic in the context of a due process challenge, for a regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause.  *See, e.g.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L. Ed.2d 1043 (1998) (stating that the Due Process Clause is intended, in part, to protect the individual against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective").  But such a test is not a valid method of discerning whether private property has been "taken" for purposes of the Fifth Amendment.

*Lingle*, 125 S.Ct. at 2083-84.

In contrast, regulatory takings analysis under *Penn Central* involves inquiry into the magnitude and character of the burden imposed by the governmental action.  The means-end test that looks at the purpose of the regulation and the relationship between that purpose and the effect of the regulation adds nothing to the regulatory takings analysis.  *Id*.  "A test that tells us nothing about the actual burden imposed on property rights, or how that burden is allocated cannot tell us when justice might require that the burden be spread among taxpayers through the payment of compensation." *Id*. at 2084.

Because the "substantially advances" test addresses the validity of a regulation, that inquiry "is logically prior to and **distinct from** the question of whether a regulation effects a taking."  *Id*. Where the government's regulation of land use is impermissible or invalid, such as where it is not rationally related to a legitimate state interest or is arbitrary or capricious, the remedy is invalidation of the regulation, and a takings analysis or remedy is inappropriate.  Such a finding ends the inquiry because the Takings Clause presupposes that the challenged governmental action is otherwise valid. If it is not, the Takings Clause does not provide a remedy since "[n]o amount of compensation" can authorize an otherwise improper or impermissible governmental action.  *Id*. at 2084.

The consequence of the *Lingle* holdings to the issue before us is clear.  The Due Process Clause and the Takings Clause provide different protections from governmental action.  Thus, either type of claim may be appropriate depending upon the governmental action complained of, the right at issue, and type of injury alleged.  Consequently, just because a zoning ordinance affects real property, a landowner is not precluded from bringing a claim challenging the validity of that ordinance on the basis it is not rationally related to a legitimate governmental purpose. The Takings Clause does not pre-empt a challenge to a zoning ordinance based on substantive due process.  To the contrary, as the Court stated in *Lingle*, the due process challenge precedes any takings claim.

We find persuasive, and more consistent with the holdings of the United States Supreme Court, the approach of the Fifth Circuit and, to the extent we correctly understand it, that of the Sixth Circuit.  Those courts  look at the actual claims to determine if the substantive due process claims

28

are in reality only recast takings claims. If not, they are separately reviewed according to applicable principles.

As a general theory, the primary purpose of a takings claim is to enforce the constitutional protection against government deprivation of private property without just compensation. It is not an attack on the validity of the governmental action itself. *See generally Preseault v. Interstate Commerce Commission*, 494 U.S. 1, 110 S.Ct. 914 (1990) (holding, in a case alleging that a federal statute was unconstitutional on its face because it took private property without just compensation, that where the law provides a method to secure just compensation, no Takings Clause violation can be shown until compensation is denied). "If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner has no claim against the Government' for a taking." *Id.* at 11, 110 S.Ct. at 921, quoting *Williamson County Regional Planning Comm'n*, 473 U.S. at 194-95, 105 S.Ct. at 3121, quoting *Ruckelshaus*, 467 U.S. at 1018 n.21, 104 S.Ct. at 2881 n.21.

As the Supreme Court recently reiterated in *Lingle*, the Fifth Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 2385 (1987). The Takings Clause is "designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.* at 315, 107 S.Ct. at 2385-86. Governmental action that works a taking triggers the constitutional obligation to pay for the property rights taken. *Id. Lingle* relies on these basic concepts concerning the purpose and effects of the Takings Clause in its rationale of the inapplicability of the "substantially advances" test. *Lingle*, 125 S.Ct. at 2080, 2084.

On the other hand, an attack on a legislative action on the basis of substantive due process directly challenges the validity of the enactment and seeks to have it voided. *Lingle*, 125 S.Ct. at 2084. Whether a governmental entity has the authority to take the action at issue is a completely separate question from whether that action resulted in a taking that must be compensated. *Preseault,* 494 U.S. at 22-24, 110 S.Ct. at 927-28 (O'Connor, J., concurring); *Ruckelshaus*, 467 U.S. at 1012, 104 S.Ct. at 2878. The Due Process Clause "safeguards citizens from arbitrary or irrational legislation." *Apfel*, 524 U.S. at 556, 118 S.Ct. at 2163 (Stevens, J. dissenting). *See also County of Sacramento*, 523 U.S. at 846, 118 S.Ct. 1708 (stating that the Due Process Clause protects the individual from "the exercise of power without any reasonable justification in the service of a legitimate governmental objective").

We conclude that Consolidated's due process claim herein was just that: an attack on the validity of the ordinances because they were not rationally related to a legitimate governmental interest. The fact that the ordinances at issue affect land use does not eliminate Consolidated's right to be free from arbitrary or irrational legislation. Consequently, we hold that Consolidated was not precluded from pursuing its substantive due process claim simply because the ordinances at issue dealt with property.

Although this discussion addresses interpretation of the United States Constitution, we are aware that Consolidated also claimed that the ordinances violated the due process and equal protection clauses of the Tennessee Constitution. We know of no State court authority stating that a substantive due process claim cannot be brought when another provision of the State constitution could also apply to the conduct or injury alleged. In particular, no State court has held that a challenge to a zoning ordinance can only be analyzed as a takings claim. To the contrary, Tennessee courts have traditionally analyzed zoning ordinances under the rational basis test as an exercise of the local government's police power. We need not decide the state law issue, however, because we think the federal substantive due process claim brought herein by Consolidated was not precluded.

## VII. RIPENESS

The Metropolitan Government argues that Consolidated was not entitled to bring its substantive due process claim because its takings claim was not ripe. The theory underlying that argument was espoused in *Montgomery v. Carter County*, *supra*, wherein the Sixth Circuit stated that, regardless of the applicability of the concept of substantive due process to a takings claim in terms of preclusion, the ripeness requirements of *Williamson County* could not be avoided by labeling a takings claim as one for denial of substantive due process. 226 F.3d at 769 (holding that substantive due process concepts "may not be used in order to mount an end run" around those requirements).[35]

Ripeness is one of the doctrines related to the issue of justiciability, and it involves both the court's power to hear and decide a dispute as well as the wisdom of doing so. Although it is sometimes combined, associated, or confused with standing or abstention, ripeness generally involves the question of whether a dispute has matured sufficiently to warrant judicial action. *See* Wright, Miller & Cooper, 13A FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2d § 3532. "The central concern is whether the case involves uncertain or contingent future events that may or may not occur as anticipated, or may not occur at all." *Id.* at 112.

The purpose of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515 (1967).

Generally, questions of ripeness involve a two-step analysis: (1) the fitness of the issue for judicial determination and (2) the hardship to the parties of withholding court consideration. *Abbott Labs*, 387 U.S. at 149, 97 S.Ct. at 1515. In most situations where ripeness is an issue, "The courts will decline to act in cases where there is no need for the court to act or where the refusal to act will not prevent the parties from raising the issue at a more appropriate time." *Martin v. Washmaster*

---

[35]*See also*, *Bigelow v. Michigan Dep't of Natural Resources*, 970 F.2d 154, 160 (6th Cir. 1992) (holding that when the substantive due process claim is ancillary or an adjunct to a takings claim, the ripeness requirements of *Williamson County* will be applied so that plaintiffs cannot "circumvent the ripeness requirement for takings claims simply by attaching a procedural due process claim to their complaint." We have held that Consolidated's due process claim was not ancillary nor an adjunct to its takings claim, but asserted rights not protected by the Takings Clause.

*Auto Ctr., Inc.*, No. 01A01-9305-CV-00224, 1993 WL 241315, at * 2 (Tenn. Ct. App. July 2, 1993) (no Tenn. R. App. P. application filed) (citations omitted).

However, as discussed earlier in this opinion, federal courts have developed specific ripeness requirements for regulatory takings claims that relate to state court action and local administrative decisions. The ripeness requirements made applicable to takings claims in *Williamson County* relate in part to the special nature of a takings claim. The requirement that the landowner first seek compensation though available state procedures, for example, is based on the interpretation of the Takings Clause as not limiting local governmental action but as requiring that the local government pay just compensation. Thus, no injury cognizable under the Takings Clause exists until just compensation has been denied, making a claim not ripe for review until that requirement is met. The Metropolitan Government does not argue that Consolidated failed to meet this part of the *Williamson County* requirements, often called the "state court" or "exhaustion" requirement. *See Montgomery*, 226 F.3d at 770.

Instead, it asserts that Consolidated's claim is not ripe for court review because Consolidated did not seek a variance from the zoning change effected by the ordinances. That requirement is based on the ripeness theory that speculative or contingent effects do not provide a justification for court decision or action. More particularly, as it has been expressed, the requirement is based on a need for more detailed facts so that the extent of the government's interference with the owner's economic expectations as to the use of the property can be determined.

The Metropolitan Government supplied the affidavit of its zoning administrator who stated that the Board of Zoning Appeals has the power or authority to grant a variance from distance requirements applicable to Class IV C&D landfills. Consolidated filed an affidavit from its president explaining why it did not seek such a variance. He explained that seeking such a variance would have been futile because under applicable Zoning Code provisions, the Board could grant a variance only where unique shape, topography, physical features, or similar characteristics of the property justified the variance in order to alleviate hardship. The relevant portions of the Zoning Code were attached to the affidavit.

The ripeness requirement that the Metropolitan Government would have us apply herein is applicable to a regulatory takings claim where the ad hoc factual inquiry established in *Penn Central* is to be applied. The case before us, as it now stands, involves a claim for denial of substantive due process by the enactment of the ordinances at issue. We decline to apply the *Williamson County* requirement of a final administrative decision on the degree of development allowed or the application of the ordinances for several reasons.

First, the requirement that a landowner seek a final decision by the zoning entity, often called the "final decision" or "final answer" requirement, as to the application of a regulation to the landowner's property does not apply to a facial challenge to a zoning ordinance, even when it is brought as a takings claim. In *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 117 S.Ct. 1659 (1997), the United States Supreme Court explained the development of the ripeness

requirement, beginning with *Agins*, wherein the Court held that, because the landowners had not submitted a plan for development, there was "as yet no concrete controversy regarding the application of the specific zoning provisions." 520 U.S. at 735, 117 S.Ct. at 1666, quoting *Agins*, 447 U.S. at 260, 100 S.Ct. at 2141. However, the Court also noted:

> In *Agins*, the landowners who challenged zoning ordinances restricting the number of houses they could build on their property sued without seeking approval for any particular development on their land. We held that the only issue justiciable at that point was whether mere enactment of the statute amounted to a taking.

*Id.*, 520 U.S. at 735, 117 S.Ct. at 1665-66. The *Suitum* court further noted that in *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 101 S.Ct. 2352 (1981), it had concluded that the as-applied challenge was unripe, but that the facial takings challenge was ripe for review. *Suitum*, 520 U.S. at 736-37, 117 S.Ct. at 1666. Based on its prior holdings, the Court explained that "such 'facial' challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed." *Suitum*, 520 U.S. at 736 n.10, 117 S.Ct. at 1666 n.10.

The distinction between facial and as-applied takings claims, in the context of the ripeness requirement of a final answer, was further set out in *Yee v. Escondido*. In that case the Court held that while *Williamson County* imposes the ripeness requirement on claims that an ordinance effects a taking as applied to the petitioner's property, it does not apply where the claim is a facial challenge alleging that the ordinance does not substantially advance a legitimate state interest. "As this allegation does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated, petitioners' facial challenge is ripe." *Yee*, 503 U.S. at 534, 112 S.Ct. at 1532.

In its most recent case involving ripeness in the context of a takings claim, the Court noted that the facial challenges to the ordinance at issue were, "of course," ripe, relying on *Yee*. *San Remo Hotel, L.P. v. City and County of San Francisco*, __ U.S. __, 2005 WL 1421451, at 12 n.23 (June 20, 2005). The Court reiterated the reasoning that where the claim alleges that an ordinance does not substantially advance a legitimate state interest, ripeness requirements do not apply since the economic impact is not relevant. *Id*.

> . . . petitioners have overstated the reach of *Williamson County* throughout this litigation. Petitioners were never required to ripen the heart of their complaint - - the claim that the [ordinance] was facially invalid because it failed to substantially advance a legitimate state interest. . . .

*Id.*, 2005 WL 1421451, at 14.

Consequently, Consolidated's takings claim itself would have been ripe for review to the extent it was based, like its due process claim, on a challenge to the relationship between the ordinances and a valid public interest. The argument that a due process challenge must be subject

to the same ripeness requirements as a takings challenge does not, in this case, mean that Consolidated was required to ask the zoning officials again how the land could be used before bringing its substantive due process and equal protection claims. Further, the holding in *Lingle*, *supra*, that the connection between the government's interest and the means chosen to achieve it is properly analyzed under due process, not as a takings claim, makes it even clearer that a facial attack on an ordinance on the basis it is not rationally related to a legitimate governmental interest can be brought without seeking administrative clarification of the exact extent of the loss caused by the ordinance.

Second, there is no requirement that a party challenging a zoning ordinance on the basis it violates substantive due process on its face because it is not rationally related to a legitimate governmental interest must seek a final administrative answer as to the ordinance's precise application.[36] To the contrary, "the very existence of an allegedly unlawful zoning action, without more, makes a substantive due process claim ripe for federal adjudication." *Pearson*, 961 F.2d at 1211. *See also Restigouche, Inc.*, 59 F.3d at 1212 (although the takings claim was not ripe, the substantive due process claim was); *Eide*, 908 F.2d at 720-24 (providing a description of the differing ripeness analyses, depending on the constitutional theories asserted and the remedies sought); *Christopher Lake Development Co. v St. Louis County*, 35 F.3d 1269, 1273 (8th Cir. 1994) (holding that for as-applied claims to be right, there must be a final decision).

The Metropolitan Government argues that the Sixth Circuit and others have more recently made clear that the final decision ripeness requirement of *Williamson County* applies to due process and equal protection claims made in the context of land use issues, relying on *Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002) and *Dougherty v. Town of North Hempstead Board of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002). This reliance is misplaced, however, because neither of these cases involved a facial challenge to an ordinance. *Dougherty* involved a city cease and desist order to prevent an owner from making improvements to his coop, which the city classified as a nonconforming use.

*Arnett* involved the destruction and removal of duck blinds by a State agency because they were unregistered as required by agency regulations. In the opinion, the Sixth Circuit stated that the

---

[36]An as-applied challenge to a legislative act may be subject to justiciability requirements similar to the "final answer" ripeness requirement. *Asarco Incorporated v. Dep't. of Ecology*, 43 P.3d 471, 476-77 (Wash. 2002). In that case, state law authorized state officials to require former landowners to pay for toxic cleanup. The former landowner and the officials were unable to agree on clean up standards. Before the extent and cost of cleanup allocated to this former owner were determined, the former landowner brought suit, based on the recent *Apfel* decision, alleging that the statute's retroactive application of the cleanup responsibility was unconstitutional for various reasons, including due process and takings. It was clearly a challenge to the statute as applied to the former owner. The Washington Supreme Court, stating it was being asked to decide an as-applied challenge "before anything has been applied," held that state law on determination of whether a regulation violates substantive due process included consideration of whether the regulation is unduly oppressive to the landowner, which included a number of factors. Without evidence on those factors, such as the availability and effectiveness of less drastic measures, the court found the as-applied substantive due process claim nonjusticiable. Obviously, the difference between as-applied and facial challenges is important in both takings and due process claims.

ripeness requirements of Williamson County apply to "procedural due process and equal protection claims that are ancillary to taking claims." 281 F.3d at 562. However, the court also found that since the blinds had been removed, the government's action was more properly characterized as a physical taking, not a regulatory taking, rendering the final decision requirement inapplicable. 281 F.3d at 563.

We find neither of these cases persuasive as to the application of ripeness requirements to a facial challenge to a zoning ordinance as lacking a rational relationship to a legitimate governmental interest. Consolidated brought only a facial challenge to the constitutionality of the ordinances.[37]

Finally, while federal courts have used these requirements to avoid hearing local zoning disputes, Tennessee courts have not imposed similar requirements on parties challenging the constitutionality of a zoning ordinance. To the contrary, parties challenging the validity or constitutionality of a zoning ordinance may bring a direct action without exhausting administrative remedies before a local zoning board. *Cherokee Country Club, Inc. v. City of Knoxville*, 152 S.W.3d 466, 479 (Tenn. 2004) (holding that the issuance of a writ of mandamus was proper even though the landowner had not appealed the denial of a demolition permit to the local board of zoning appeals because the landowner challenged the validity of an ordinance, not the official's discretion in denying the permit); *Poteat v. Bowman*, 491 S.W.2d at 77, 80 (Tenn. 1973) (stating that a claim that an ordinance on which a permit denial is based is unconstitutional is not subject to the exhaustion of administrative remedies requirement).

When decisions applying zoning ordinances are made by local zoning administrators and boards, judicial review is under the common law of writ of certiorari, which provides a limited scope of review by the courts. *Fallin v. Knox County Bd. of Com'rs*, 656 S.W.2d 338, 342-43 (Tenn. 1983); *Lafferty v. City of Winchester*, 46 S.W.3d 752, 758 (Tenn. Ct. App. 2001). Long-standing policy favors permitting the local decision-makers, who are granted broad discretion in the first instance, to exercise that discretion. *McCallen v. City of Memphis*, 786 S.W.2d 633, 641-42 (Tenn. 1990). The determinations made by a local zoning board are administrative determinations, judicial or quasi-judicial in nature, made after a hearing where a record of the evidence and the proceedings is made. *Fallin*, 656 S.W.2d at 342-43. Consequently, review is by common law writ of certiorari upon the record produced by the zoning board, and parties must exhaust their administrative

---

[37]    A zoning ordinance may be challenged as violative of substantive due process either on its face or as applied to a particular parcel of land. *See Pearson* [*v. City of Grand Blanc*], 961 F.2d [1211] at 1216 [(6th Cir. 1992)]. When a landowner makes a facial challenge to a zoning ordinance, "he or she argues that any application of the ordinance is unconstitutional." *SMX Technologies, Inc. v. Gasconade County*, 105 F.3d 1195, 1198-99 n.1 (8th Cir. 1997). "When one makes an 'as applied' challenge, he or she is attacking only the decision that applied the ordinance to his or her property, not the ordinance in general." *Id*.

*Richardson*, 218 F.3d at 513.

34

remedies by pursuing appeals to that board.[38]

The same policies and circumstances are not present in a challenge to a legislative action through enactment of zoning ordinances. "[T]he enactment of ordinances or resolutions, creating or amending zoning regulations, is a legislative, rather than an administrative, action and is not ordinarily accompanied by a record of the evidence, as is the case of an administrative hearing." *Fallin*, 656 S.W.2d at 342-43. Consequently, court challenges to the validity of such ordinances are generally brought as actions for declaratory judgment. *Id.*; *Thompson v. Metropolitan Government of Nashville and Davidson County*, 20 S.W.3d 654, 660 (Tenn. Ct. App. 1999). There is no requirement of exhaustion of administrative remedies in a direct challenge to the facial validity of an ordinance.

Under the Declaratory Judgment Act, any person whose rights, status or other legal relations are affected by a statute or municipal ordinance "may have determined any question of construction or validity arising under" the statute or ordinance and "obtain a declaration of rights, status or other legal relations thereunder." Tenn. Code Ann. § 29-14-103. The Act nowhere imposes or provides an administrative remedy for parties challenging the validity of a statute or ordinance. *See Thomas v. State Bd. of Equalization*, 940 S.W.2d 563, 566 (Tenn. 1997) ( holding that if a statute explicitly provides an administrative remedy, a party must exhaust this remedy prior to seeking relief from the courts). None of the considerations that would justify judicial imposition of a requirement of administrative recourse exists in the case before us. *See Thomas*, 940 S.W.2d at 566; *Reeves v. Olsen*, 691 S.W.2d 527, 530 (Tenn. 1985) (explaining the purposes behind the exhaustion doctrine).

In fact, in view of the nature of the claim made by Consolidated and the remedy sought, it would be inappropriate to require it to go to the Board of Zoning Appeals before seeking recourse in the courts. Where a party brings a facial challenge to the constitutional validity of a statute or ordinance, there is no requirement that the party first seek a ruling on that issue from the administrative body charged with applying or enforcing the legislation.[39] *Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 456 (Tenn. 1995). That is because administrative officials and bodies do not have the authority to declare a statute or ordinance unconstitutional. *Id.* at 452. "The facial constitutionality of a statute may not be determined by an administrative tribunal in an administrative proceeding." *Id.* at 454. *See also City of Memphis v. Shelby County Election Commission*, 146 S.W.3d 531, 537 (Tenn. 2004).[40]

---

[38]Williamson County distinguishes between ripeness and exhaustion. 473 U.S. 192-93, 105 S.Ct. at 3119-20. That distinction is not important in the context of the issue as presented in this case or to the state law analysis.

[39]We are aware that the Metropolitan Government's position is that Consolidated could have asked the Board to relieve it from the two-mile distance requirement, not that Consolidated could have asked the Board to declare the ordinances unconstitutional. Where the challenge is facial, rather than as-applied, no administrative determination of the ordinance's application to a particular situation is required.

[40]Even where exhaustion is generally required, there are exceptions. As just discussed, one exception applies where the party challenges the validity of an ordinance or statute that would be applied by the administrative decision maker. *Poteat*, 491 S.W.2d at 80. Another applies where the party seeking judicial review raises only questions of law

We conclude that Consolidated was not precluded by any ripeness requirement from bringing its facial challenges to the ordinances based on substantive due process and equal protection grounds.

## VIII. PROPERTY INTEREST

The Metropolitan Government also argues that Consolidated lacked a sufficient property interest to have standing to bring even a facial challenge to the ordinances on substantive due process grounds. The Metropolitan Government asserts that because Consolidated did not own the property in question, but merely held an option to purchase and a leasehold interest, it had no constitutionally protected interest. Consequently, the Metropolitan Government asserts, because Consolidated had no vested property right it had no standing to bring a substantive due process claim at all, whether that challenge was to the ordinances as written or as applied.

The trial court stated that the vested right requirement for standing to seek damages or injunctive relief as a result of a zoning change was much higher than the interest required to give a plaintiff standing to ask for declaratory prospective relief:

> The Court observes that the facial challenges to the ordinances can be made even if the plaintiff has no vested right in the property. *See Yee v. City of Escondido*, 503 U.S. 519, 534, 112 S.Ct. 1522, 1532 (1992). The Metropolitan Government agrees that the facial challenges to the zoning ordinances may still be considered absent a vested right. A facial challenge will survive even when rights have not vested because "[t]his allegation does not depend on the extent to which petitioners are deprived of the economic use of their . . . property or the extent to which these particular petitioners are compensated." *Yee*, 503 U.S. at 534, 112 S.Ct. at 1532. Damages and other specific relief require vesting. However, facial challenges that seek declaratory relief are more readily available. *See Harris v. City of Wichita, Sedquick County, Kan.*, 862 F.Supp. 287, 291 (D. Kan. 1994).

The court held that to bring a substantive due process challenge to the ordinances on their face, a plaintiff is only required to have "a legitimate claim of entitlement or justifiable expectation in the use of the property."

---

rather than questions of fact. *Bracey v. Woods*, 571 S.W.2d 828, 830 (1978); *Fentress County Bank v. Holt*, 535 S.W.2d 854, 857 (Tenn. 1976). A third exception applies where pursuit of administrative relief would be futile or useless. *State v. Yoakum*, 201 Tenn. 180, 195, 297 S.W.2d 635, 642 (1956). Stated another way, a party is not required to seek administrative review or relief if the administrative process would have afforded no review "over key issues" and would have afforded no possible remedy. *Cherokee Country Club, Inc.,* 152 S.W.3d at 479. The United States Supreme Court has apparently adopted a "futility" exception to the final decision requirement. *See Palazzolo*, 533 U.S. at 620-26, 121 S.Ct. at 2459-63 (holding the claim was ripe because the state had made it clear no development would be allowed on the wetlands portion of a piece of property where the landowner asserted a *Lucas*-based *per se* taking). Consolidated relied on the futility exception.

As the trial court noted, the Metropolitan Government did not originally challenge Consolidated's right to bring a facial challenge to the ordinances on the basis it did not have a vested property interest.[41] Consequently, Consolidated argues that the Metropolitan Government is precluded from raising that challenge in this court. In fact, Consolidated states that the Metropolitan Government is attempting to reverse its position because it conceded in the trial court that the facial challenge was proper. Consolidated relies on the well-settled principle of appellate litigation that "a party on appeal will not be permitted to depart from the theory on which the case was tried in the trial court" and that issues not raised or complained of in the trial court will not be considered on appeal. *TAMCO Supply v. Pollard*, 37 S.W.3d 905, 909 (Tenn. Ct. App. 2000).

The Metropolitan Government responds that, although its initial arguments in the trial court included statements to the effect that Consolidated could maintain its facial challenges to the ordinances, the Metropolitan Government raised the standing objection in its motion to alter or amend and, therefore, has not presented a different theory on appeal than was presented to the trial court. We have reviewed that motion and, while it does raise other bases for precluding Consolidated's substantive due process and equal protection claims (discussed earlier in this opinion), the motion does not mention the insufficient property interest issue. The Metropolitan Government did not bring to the trial court's attention its current assertion that Consolidated lacked standing because it had no constitutionally protected interest, clearly a change from its earlier position.

We agree with Consolidated that the Metropolitan Government cannot raise an issue for the first time on appeal. Generally, this court will not entertain an issue on appeal that was not raised in the court below. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991) (citing *Lovell v. Metro. Gov't*, 696 S.W.2d 2 (Tenn. 1985)); *Davis v. Tennessean*, 83 S.W.3d 125, 127 (Tenn. Ct. App. 2001); *Harlan v. Hardaway*, 796 S.W.2d 953, 957 (Tenn. Ct. App. 1990). Numerous Tennessee cases hold that an issue raised for the first time on appeal is waived. *See, e.g., Norton v. McCaskill*, 12 S.W.3d 789, 795 (Tenn. 2000); *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983) (noting, "It has long been the general rule that questions not raised in the trial court will not be entertained on appeal . . ."). An issue not presented to, decided by, or dealt with by the trial court will not be considered by appellate courts. *In re Adoption of a Female Child*, 42 S.W.3d 26, 32 (Tenn. 2001); *Reid v. State*, 9 S.W.3d 788, 796 (Tenn. Ct. App. 1999). Consequently, we will not determine that issue.

Nonetheless, we must observe that, as the discussion of the four dissenting justices and

---

[41] Documenting its statement regarding the Metropolitan Government's agreement with the conclusion that a facial challenge was available, quoted earlier, the trial court stated in a footnote:

On page 5 of defendant's sur-reply and memorandum of law to plaintiff's response to defendant's motion for summary judgment The Metropolitan Government states, "[i]n our case, Consolidated has no vested rights, and thus can only make a facial challenge, which at best can result in a 'remand' to the Metropolitan Government to correct any constitutional flaws this court finds in the present zoning ordinances."

Justice Kennedy in *Apfel* demonstrates, "property" is defined more broadly in a due process analysis than in a takings clause analysis. *See Corn v. City of Lauderdale Lakes, supra,* 95 F.3d at 1075 ("Property as that word is used in the 'Takings Clause' is defined much more narrowly than in the due process clauses"; *Bryan v. City of Madison*, 130 F. Supp. 798, 809 (S.D. Miss. 1999) ("Even if certain property interests may not be taken without due process, they can be taken without paying just compensation"). *See also* Matthew C. Porterfield, "International Expropriation Rules and Federalism," 23 STAN. ENVTL. L.J. 3, 11 n. 40 (Jan. 2004).

We also note that the oft-recited test for standing to bring a procedural due process claim does not necessarily apply to a facial challenge to an ordinance under substantive due process. *See Richardson*, 218 F.3d at 513 n. 3 (acknowledging that the property interest standard for substantive due process should be clarified, but declining to do so) and at 518 (Ryan J., concurring) (stating there is "considerable confusion" regarding the property interest a plaintiff must assert, which "the Supreme Court has thus far not dispelled," but acknowledging that some circuits, including the Sixth, have recognized a distinction between the kind of property interest protected by procedural due process and that protected by substantive due process). "Regrettably, the case law provides relatively little specific guidance as to what constitutes a property interest worthy of substantive due process protection." *Parks Properties v. Maury County*, 70 S.W.3d 735, 744-45 (Tenn. Ct. App. 2001).

Additionally, we must also point out state law in light of the only relief the trial court gave to Consolidated. In its complaint, Consolidated specifically asked that the court issue a declaratory judgment pursuant to Tenn. Code Ann. §§ 29-14-101 - 113 that the ordinances were enacted in violation of the equal protection and due process clauses of both the Tennessee and United States Constitutions and were, therefore, invalid and of no effect.

Tennessee statutes on declaratory judgments give courts the power "to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Tenn. Code Ann. § 29-14-102 (a). Specifically, any person, including any corporation, whose rights, status or other legal relations are affected by any question of the validity of an ordinance may obtain a declaration of such rights, status, or other legal relations thereunder and a determination of the validity or any question of construction of the ordinance. Tenn. Code Ann. § 29-14-103. The statutes on declaratory judgments are to be construed liberally to further their purpose of settling and affording relief from uncertainty as to rights, status, and other legal relations. Tenn. Code Ann. § 29-14-113. Thus, in the case of a challenge to the validity of an ordinance, standing is determined by whether the party's rights, status or other legal relations are affected by the ordinance.

There can be little doubt that Consolidated met this low threshold necessary to obtain a simple declaratory judgment. *See Robertson County v. Browning-Ferris Industries, Inc.*, 799 S.W.2d 662 (Tenn. Ct. App. 1990) (although standing was not addressed, party who obtained a declaratory judgment that the zoning ordinance was invalid leased the property in question with an option to purchase for the purpose of developing a landfill).

38

Finally, neither the property interest argument, nor some of the other procedural challenges the Metropolitan Government has raised, apply to claims based on denial of equal protection.

## IX. MERITS OF SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION CLAIMS

The trial court did not question the validity of the public interest and welfare alleged to be the purposes of the ordinances. Its rulings are based on its determination that the ordinances as drafted did not further the stated purposes and there was no rational justification for the harsher treatment afforded to C&D landfills. Thus, the trial court's holding was based on its analysis of the essential nexus between the purpose and the legislation, or the means/end test, *i.e.*, whether the ordinances were unreasonable means of advancing a legitimate government interest. *See Richardson*, 218 F.3d. at 513; *Berger*, 154 F.3d at 624.

With regard to the substantive due process claim, the trial court found:

Metro has failed to connect a rational relationship between these ordinances and a legitimate governmental purpose. While Metro does contend that the protection of schools and parks from the dust, debris, and trash is a viable interest, it fails to overcome the arbitrary and capricious nature of the ordinances in that they only apply to C&D landfills and not other types of landfills and industrial uses which pose essentially the same threats. Waste deposited at C&D landfills is different from waste deposited at sanitary and other types of landfills. However, all types of landfills threaten the safety and welfare of citizens. The dust, noise, traffic, and other considerations associated with C&D landfills would also be associated with other waste facilities and industrial uses not restricted by the two (2) mile buffer.[42] The ordinances at issue arbitrarily single out C&D landfills and Metro has articulated no rational reason how the two (2) mile buffer for only these landfills serves a legitimate governmental purpose. Recall that the Planning Commission acknowledged that its own staff found "no rational basis for a two mile standard" and the Planning Commission disapproved the ordinances by a unanimous vote finding "no planning

---

[42]In a footnote, the trial court compared the requirements for the two types of landfills:

Chapter 10.20 of the Metro Code indicates that a sanitary landfill is used to dispose of solid waste materials which include all municipal, commercial or industrial solid waste, garbage, rubbish, refuse and other such similar and related materials. Section 17.16.210 of the Code provides the special exceptions for sanitary and C&D landfills. A sanitary landfill must be on a minimum lot of one hundred (199) acres; be one hundred (100) feet from any property line; two hundred fifty (250) feet from any residential zoning district boundary; and five hundred (500) feet from any residential structure. A landscape buffer yard is required and driveway access must be from a collector street.

By comparison, the C&D landfill must, along with the two (2) mile buffer at issue, be one hundred (100) feet from any residential zone district or district permitting residential use. There must be the same landscape buffer yard on the property lines. Finally, the C&D landfill must have driveway access on nonresidential collector streets.

basis" to support the two (2) mile buffer. In fact, the evidence in the record strongly indicates that the other uses pose a greater threat to the public health.

Also, the plaintiff supports its position with the argument that Metro has failed to institute a counter-buffer requirement for schools and parks. *See generally City of Miami v. Woolin*, 387 F.2d 893 (5th Cir. 1968); *Saar v. Town of Davie*, 308 F.Supp. 207 (S.D. Fla. 1969). The Court finds it difficult to conceive that a C&D landfill cannot be built within two (2) miles of a school or park, yet a school or park may be built within two (2) miles of an operational C&D landfill. The same safety and health concerns would require a buffer in both instances.

. . .

The two (2) mile buffer between C&D landfills and schools and parks appears many times more than a necessary distance. This restriction is more arduous than that imposed on other types of even more disruptive landfills and schools and parks are not precluded from being built within two (2) miles of a C&D landfill. Courts must draw the line between the rational and irrational and while the *Riggs* helicopter buffer falls on the side of having a rational basis, these ordinances fall on the side of the irrational and arbitrary. One cannot help but conclude from this record that the two (2) mile buffer was not designed to protect schools and parks but to simply prevent new C&D landfills in most parts of Davidson County. There is no doubt in *Riggs* that the restriction was designed to and would be effective in protecting the peace and quiet of the Great Smokey Mountains National Park.

As to the equal protection claim, the court also found that the Metropolitan Government had failed to establish a rational relationship between the legitimate interests propounded and the differing treatment afforded C&D landfills compared to similar facilities that pose greater threats.

The trial court acknowledged that all the Metropolitan Government needed to show was a rational basis for the separate classification of C&D landfills, but found that the Metropolitan Government had not made that showing. It held that the Metropolitan Government had failed to articulate a reasonable basis for classifying, and subjecting to stricter requirements, C&D landfills from other, similar uses even though the Metropolitan Government acknowledges that other type landfills are more noxious, but do not have the same buffering requirement. The court found:

The same protections necessary for a C&D landfill would also be present for other types of landfills. Evidence in the record indicates the C&D landfills pose less of a risk than others.

The court pointed out affidavit testimony of an engineer who opined that a properly constructed and managed C&D landfill poses less risk to human health and the environment than would: a Class I municipal solid waste landfill, a Class II medical waste processing facility or

industrial waste disposal facility, or a Class III farming waste disposal facility or landscaping and land clearing waste disposal facility. The court further pointed out that the Metropolitan Government's Interim Director of Public Works stated in his deposition testimony that landfills other than C&D landfills should have restrictions similar to those the ordinances made applicable to C&D landfills only.

On appeal, the Metropolitan Government challenges the trial court's equal protection argument, first, by arguing that C&D landfills are not the same as other types of landfills and waste disposal facilities, so they are not similarly situated. Therefore, ordinances treating them differently do not violate equal protection, and courts must afford wide discretion to legislative bodies in deciding which activities are the same and which are different. The Metropolitan Government points to other provisions of its Code as well as to State regulations that impose different requirements on different types of landfills.

While we agree that the Metro Zoning Code and Tennessee Department of Environment regulations define types of waste facilities differently and may impose different requirements on them, the operational requirements imposed by the State are tailored to the specific activities carried on at the site. Further, it appears that sanitary landfills and some other types of facilities are subject to more stringent requirements than C&D landfills by both state and local regulations. The Metropolitan Government does not disagree that sanitary landfills and some other facilities pose greater health and safety risks and/or disruption than C&D landfills, but cannot explain why only C&D landfills must be located more than two miles from parks and schools.

Second, the Metropolitan Government asserts that, even if different types of landfills or similar uses of real property can be considered similarly situated, a rational basis exists for imposing the two-mile buffer requirement on C&D landfills. In support of this argument, the Metropolitan Government points out that the construction of C&D landfills can be permitted without Council approval, while sanitary landfills must secure such approval. "Thus, in drafting the ordinances in question, the Council may have felt that an additional buffer requirement was only necessary for C&D landfills because the Council was at that time unable to review and control the placement of such landfills in proximity to parks and schools."

The Metropolitan Government made this argument to the trial court, who found it unavailing, noting that when considering a Class I sanitary landfill, Council would not be required to apply a two-mile buffer. "While the court would anticipate that sound judgment would warrant greater protections in locating these landfills, the buffer is not a stated requirement." For similar reasons, we agree. When a legislative body reserves the right to apply existing zoning ordinances and to grant or deny permits based on those ordinances, it must make any decision under that grant by applying existing requirements. *McCallen*, 786 S.W.2d at 639. In that context, the legislative body would be making an administrative or quasi judicial decision, rather than performing a legislative act, because it would be executing a law already in existence. *Id*. The Metropolitan Council, making an administrative decision on approval of a proposed landfill, must apply the requirements it has enacted in its legislative role and cannot create new or additional requirements in the context of a

particular request for approval. We fail to see how the requirement of Council approval for sanitary landfills is relevant to the question of whether there is a rational basis for an ordinance establishing the two-mile buffer on C&D landfills only.

We have reviewed the voluminous filings in the record and reach the same conclusions as the trial court. C&D landfills do not pose as great a risk to public welfare as other types of landfills or similar facilities, yet the Metropolitan Government has not justified imposition of stricter location requirements on them. Further, as the Planning Commission found, there is no planning policy basis for choosing two miles as opposed to any other particular distance; there is no proof that a two-mile buffer meets the stated goals (protecting parks and schools from effects such as dust, noise, and truck traffic) and another distance would not.

Based on the record before us, we affirm the trial court's holding that the ordinances in question violate the substantive due process and equal protection guarantees in both the United States and Tennessee Constitutions.

## X. EXCLUSIONARY ZONING

In the trial court, Consolidated argued that the ordinances were invalid because their effect was to preclude construction and operation of a lawful business, a C&D landfill, within the county. It contended that such preclusion is unlawful unless certain showings are made, relying on *Robertson County v. Browning-Ferris Industries, Inc*., 799 S.W.2d 662, 666 (Tenn. Ct. App. 1990). Consolidated did not allege that the ordinances specifically prohibited the business in the county, but instead, argued that the ordinances as applied had that practical effect, characterizing its claim as one of *de facto* exclusionary zoning. Consequently, a logical place to begin is with the question of whether, as a matter of fact, there is no location in Davidson County where a new C&D landfill could be constructed and operated in compliance with all applicable state and local regulations.

Consolidated presented an affidavit prepared by Charles Higgins, Jr., an engineer with considerable experience in land use regulation of landfills and similar facilities. He identified potential C&D landfill sites in Davidson County under the pre-amendment zoning regulations as well as under the two-mile-buffer ordinances. Such sites are influenced by a number of factors, including soil conditions and State imposed requirements such setbacks from streams, etc. Mr. Higgins stated that he considered six factors: geography (including topography and locations of schools and parks), transportation, hydrology, land use, zoning restrictions, and size. He included only sites of at least ten acres. Of the initial twenty-nine potential sites examined, many were excluded by topography and the common presence of streams and lakes making the size of the tract, with the required setbacks, inadequate. An additional limiting factor was the location of the site in relation to a non-residential collector road.

The report concluded, in pertinent part, that the only area identified as having potential for C&D landfill development under existing zoning restrictions were in those districts where such facilities were SE (permitted by special exception) uses. Further,

42

Of the 29 potential SE use sites examined in this process, one site owned by the Metro Government has clear potential for use as a C&D landfill and is the largest. Two other sites appear to have potential (one on a non-conforming local collector and one not on a collector of any kind.)

Two sites were found that appear to have potential for C&D landfill, but would require the removal of numerous structures, including ponds in some cases, to obtain an adequate footprint. One site would be recommended for further study to clarify marginal soil conditions, if it was located on a non-residential collector.

The report then identified the six potential sites with their primary characteristics and concluded that "No sites were found to be both 2 miles from a park or school and located on a non-residential collector."

It is the "non-residential collector" requirement, which describes a type of roadway, that is the basis of the dispute herein. Both parties agree that Section 17.16.210A.3[43] of the Zoning Code require that C&D landfills be located on, or have driveways into, non-residential collector streets. In the trial court, the Metropolitan Government disagreed with Mr. Higgins's conclusion that the six sites identified were not located on such streets, asserting that Mr. Higgins "misunderstood the zoning codes."

In support of that contention, the Metropolitan Government submitted the affidavit of its Zoning Examination Chief, who is also the Secretary for the Board of Zoning Appeals, Mr. Charles Shepherd. Mr. Shepherd's responsibilities include determining whether a proposed use on a property complies with the Zoning Code. He stated that a number of zoning provisions require that various uses, in addition to C&D landfills, be located on and/or have driveway access to a "nonresidential collector," but that that term is not defined in the Metropolitan Code of Laws. He further stated:

> As such my department in enforcing this provision has followed the following procedure: (1) we determine if the business in question abuts a collector street as identified on the major street and alley map for Nashville and Davidson County; (2) we then examine the zoning along this collector street in both directions from the proposed business until the first major intersection with a collector or arterial; if the zoning is residential on either side of the street, then the collector is not a nonresidential collector, if the zoning is anything but residential, including agricultural, then the street is a nonresidential collector.
>
> I am aware that the Department of Public Works has certain standards for the

---

[43]That section is within the article of the zoning code that governs uses permitted by special exception and is entitled "Waste management special exceptions." As to C&D landfills, there is a setback requirement of 100 feet from any residential zone district or district permitting residential use. A landscape buffer is required. Additionally, the provision at issue states, "At a minimum, the construction/demolition landfill uses shall have a driveway access on nonresidential collector streets."

construction of a non-residential collector street; these standards are not utilized in determining whether a street is a nonresidential collector for zoning purposes.

I am aware that the Planning Department has certain standards for the construction of non-residential collector streets within subdivisions; these standards are not utilized in determining whether a street is a nonresidential collector for zoning purposes.

A collector street which is entirely contained within an agricultural zone from major intersection to intersection, would be considered a nonresidential collector for zoning purposes; regardless of the width of its pavement or the width of it right-of-way, and regardless of the construction or subdivision standards of other departments of the Metropolitan Government.

On the basis of this testimony, Metro asserted that a road that is a collector on the Major Street and Alley Map of Nashville and Davidson County is a nonresidential collector if it is located entirely in any nonresidential zone (including agricultural). Under that definition, according to the Metropolitan Government, the roads associated with the six parcels identified in the conclusion of Mr. Higgins's report are nonresidential collectors because they lie entirely within agricultural zones.

Consolidated contended that the Subdivision Regulations of the Metropolitan Planning Commission include standards for a "nonresidential collector street" and those standards are applicable to the interpretation of the similar term in Section 17.16.210A.3 of the Zoning Code. As Consolidated frames the issue, "If . . . the Street Standard in the Subdivision Regulations control, as opposed to the definition the Metropolitan Government claimed was applicable, the uncontradicted proof in the record establishes that adoption of [the subject ordinances] resulted in the *de facto* exclusion of construction and demolition landfills in Davidson County."

On the issue of exclusionary zoning, the trial court recited the applicable test from *Robertson County*, explained that the Metropolitan Government's position was that there were at least six available sites where a C&D landfill could be built, and that Consolidated had the burden to establish that C&D landfills had been totally excluded from the county. The court found that the affidavits submitted by each party disagreed on the definition of nonresidential collector streets. In resolving that disagreement, the court stated

The Court believes that the standard asserted by Metro is the most tenable. Evidence in the record indicates that representatives of Metro have consistently interpreted the term to include any street located entirely in a nonresidential zone so that it would allow other sites to serve as C&D landfills.

Having determined that the definition supplied by the Metropolitan Government was the correct one, the court concluded that no exclusionary zoning had occurred by virtue of the ordinances.

44

The construction or interpretation of a statute is a question of law. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998). Our review of a trial court's determinations on issues of law is *de novo,* with no presumption of correctness. *Frye v. Blue Ridge Neuroscience Center, P.C.*, 70 S.W.3d 710, 713 (Tenn. 2002); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn.2000). Our role is to ascertain and give effect to legislative intent, finding that intent, whenever possible, in the natural and ordinary meaning of the words used in the statute. *Myint,* 970 S.W.2d at 924.

The primary rule of statutory construction is "to ascertain and give effect to the intention and purpose of the legislature." *LensCrafters, Inc. v. Sundquist*, 33 S.W.3d 772, 777 (Tenn. 2000); *McGee v. Best*, 106 S.W.3d 48, 64 (Tenn. Ct. App. 2002). To determine legislative intent, one must look to the natural and ordinary meaning of the language used in the statute itself. We must examine any provision within the context of the entire statute and in light of its over-arching purpose and the goals it serves. *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn.2000); *Cohen v. Cohen*, 937 S.W.2d 823, 828 (Tenn. 1996); *T.R. Mills Contractors, Inc. v. WRH Enterprises,* LLC, 93 S.W.3d 861, 867 (Tenn. Ct. App. 2002). The statute should be read "without any forced or subtle construction which would extend or limit its meaning." *National Gas Distributors, Inc. v. State*, 804 S.W.2d 66, 67 (Tenn.1991). As our Supreme Court has said, "[w]e must seek a reasonable construction in light of the purposes, objectives, and spirit of the statute based on good sound reasoning." *Scott v. Ashland Healthcare Center, Inc.*, 49 S.W.3d 281, 286 (Tenn. 2001), citing *State v. Turner*, 913 S.W.2d 158, 160 (Tenn. 1995). Courts are also instructed to "give effect to every word, phrase, clause and sentence of the act in order to carry out the legislative intent." *Tidwell v. Collins*, 522 S.W.2d 674, 676-77 (Tenn.1975). *In re Estate of Dobbins*, 987 S.W.2d 30, 34 (Tenn. Ct. App. 1998). The same rules and principles are applied when construing zoning ordinances. *Lions Head Homeowners' Ass'n v. Metropolitan Bd. of Zoning Appeals,* 968 S.W.2d 296, 301 (Tenn. Ct. App. 1997).

Consolidated argues that the standards to be applied are found in Section 2-6.2 of the Subdivision Regulations. We have reviewed the Regulations, which were put into the record by Consolidated, but we are unable to find a definition or standard for "nonresidential collector street." The general definitional section for the entire set of regulations defines "collector street" as "a street intended to move traffic from local roads to arterial routes. A collector street serves a neighborhood or large subdivision." "Local street" is not defined, but "major street" and "arterial street" are.

Section 2-6.2 of the Regulations, the section referenced by Consolidated, is entitled "Street Requirements" and contains requirements that are to apply to all streets in or related to proposed subdivisions. Those requirements include a section on "Street Design Standards", such as sight distance, grades and cross-slopes, vertical design, right-of-way and pavement width, horizontal radius of curved streets, turnarounds, intersection design, number of intersecting streets, and minimum design speeds. Several tables in the "Street Design Standards" section distinguish the requirements for "local streets" and "collectors", or, in some instances, "minor local", "local", and "collector."

To identify the actual import of Consolidated's assertions that the Subdivision Regulations' standards apply, it is necessary to consult the affidavit of Consolidated's expert, Mr. Higgins. In reaching his conclusion that the six parcels he identified did not meet the zoning requirement regarding nonresidential collectors, he used a table in the "Street Design Standards" section of the Regulations as establishing the definition for such streets. He interpreted the table and requirements in the "Street Design Standards" section as requiring a minimum right-of-way and pavement width for non-residential collectors of 72 feet and 49 feet respectively "(the largest ROW and pavement widths specified)." He stated that "local connectors must meet the lesser standards of 60 ft. and 37 ft., respectively." He also identified three roads adjacent to some of the six parcels that he stated were "typically classified as 'local connectors,' not 'non-residential collectors.'

Consolidated argues that the Subdivision Regulations street standards apply to the Zoning Code's use of the term nonresidential connector by virtue of Section 17.12.030B of the Code, which provides:

> Street Classifications. All street classifications are established in the "Subdivision Regulations of the Metropolitan Government of Nashville and Davidson County" and the "Major Street Plan" as adopted by the Metropolitan Planning Commission.

That section of the Zoning Code is entitled "Street Setbacks," and the requirements for non-residential districts and uses are classified as applying to either "Non-Arterial Streets" or "Arterial Streets."

We do not necessarily disagree that this provision makes the Subdivision Regulations an acceptable reference for some purposes in interpreting the Zoning Code, but that purpose is established by the section itself: determining setbacks. Section 17.12.030B does not use the term "nonresidential connector." Additionally, the only "street classifications" we find in the Subdivision Regulations are the definitions. The standards used by Mr. Higgins are design standards. Nothing in the regulations incorporates those standards into the definition of collector or other terms. In other words, we cannot interpret the regulations as establishing that only a street with the specified paving and right-of-way widths can be called a connector.[44]

We conclude that the definition of nonresidential connector supplied by the local zoning official and traditionally and consistently used to determine compliance with Zoning Code requirements is a reasonable construction in light of the purposes and objectives of the zoning ordinances and is based on sound reasoning. An agency's interpretation of the statutes it is charged with implementing, as well as its own rules, is entitled to great weight if that interpretation is

---

[44]We also note that the Zoning Code's section referring to street classifications also refers to the "Major Street Plan." Mr. Shepherd stated that in determining if a piece of property has the required access to a nonresidential connector, his department first determines if the property is "a collector street as identified on the major street and alley map." Assuming the map and the plan are the same, the zoning officials' reliance on that document is consistent with that provision of the Zoning Code, even if the street classification language is interpreted as applying to anything other than setbacks.

consistent with the statutes. *See Exxon Corp. v. Metropolitan Government*, 72 S.W.3d 638, 641 (Tenn. 2002). Consequently, we adopt that interpretation. The result is that Consolidated has not proved that there are no areas in the county where a new C&D landfill can be constructed and operated in compliance with the zoning regulations, including the ordinances that triggered this litigation.

Our choice to resolve the exclusionary zoning issue, like the trial court, on the basis of the arguments presented by the parties, should not be interpreted as any agreement by us with the argument that even if the roads at issue were determined not to be nonresidential connectors that Consolidated would have established the elements of exclusionary zoning. First, the expert's report considers factors other than State and local regulations over which the Metropolitan Government has no control. We are unaware of any legal principle that would require Metro, for example, to change or lessen its requirements for a C&D landfill simply because topography, soil conditions, and the presence of streams limit the places where it is practical or profitable to build such a landfill. Additionally, *Robertson County* involved a county zoning ordinance that, by its terms, did not allow location of a landfill within the county. The Zoning Code of the Metropolitan Government specifically allows C&D landfills and sets requirements for them; some such facilities already exist and are operating in the county. Further, this is not a situation where the two-mile buffer ordinances themselves operated to preclude all C&D landfills. In other words, there is no proof that there is no land in the county that is more than two miles from a park or school.

We need not decide the issues raised by these observations. We point them out merely because we disagree with Consolidated's argument that if the trial court incorrectly interpreted the nonresidential connector requirement, it was entitled to summary judgment that the ordinances effect exclusionary zoning.

## XI. POST-JUDGMENT INJUNCTION

The trial court granted summary judgment to Consolidated on the constitutional grounds and issued a declaratory judgment that the two ordinances, on their face, violate substantive due process and equal protection rights. The ordinances were, therefore, unenforceable. The court also stated, "As Consolidated has no vested rights, as previously determined by the Court, no other remedies are available," declining to enjoin enforcement of the ordinances (although void ordinances are unenforceable).

The Metropolitan Government then filed a motion to alter or amend the judgment, or, in the alternative, for injunctive relief. The trial court denied the motion to alter or amend, but set argument on the request for injunctive relief. The Metropolitan Government sought an order enjoining Consolidated from further developing the land at issue until the Metropolitan Government had a reasonable opportunity to cure the defects of the zoning ordinances in question by amending those ordinances. As grounds, the Metropolitan Government asserted that (1) zoning is a legislative function and (2) the status quo should be maintained in order to give the legislature time to amend an invalid ordinance. Attached to the motion was a copy of an ordinance that had already been

47

introduced in the Metropolitan Council.

After further filings by the parties and a hearing, the trial court determined that since it had previously ruled that Consolidated had no vested interest in developing a landfill on the property at the time the ordinances were passed, the injunction should issue based in large part upon the holding in *Robertson County*, *supra*, 799 S.W.2d 662. Accordingly, the court gave the Metropolitan Government one hundred fifty (150) days to amend the ordinances, during which time Consolidated was enjoined from further action to develop the C&D landfill on the property.

Consolidated appeals the injunction granted after the court's judgment on the merits, asserting that a post-judgment temporary injunction that was never requested in the pleadings has no basis in law or applicable procedure. While in its motion the Metropolitan Government apparently asked for a temporary injunction pursuant to Tenn. R. Civ. P. 65.04, the trial court based its ruling on Tennessee Code Annotated § 29-14-110, part of the Declaratory Judgment Act, which allows further relief "whenever necessary or proper."

Consolidated argues (1) any "further" relief granted must be based on the declaratory judgment, not inconsistent with it, and cannot nullify it; (2) this case differs factually from *Robertson County* in that the trial court's action herein in declaring the two ordinances unconstitutional and unenforceable left in place prior zoning; and (3) by issuing the injunction, the trial court engaged in zoning, which is a legislative function.

By the time this appeal was argued, the 150 days had run and the injunction had expired. Therefore, the issues surrounding the injunction are moot.

## XII. ATTORNEY'S FEES

The trial court awarded Consolidated attorney's fees in the amount of $ 95,000,[45] pursuant to 42 U.S.C. § 1988, and expenses for expert witnesses and court reporters in the amount of $5,277.28, pursuant to Tenn. R. Civ. P. 54.04(2). The Metropolitan Government appeals the attorney's fee award arguing, first, that Consolidated was not a prevailing party under correct interpretations of the statute. It also argues that, even if Consolidated was a prevailing party, the remedy granted it was so nominal that no award of fees was reasonable.

### A. NOTICE OF APPEAL

Consolidated responds that the Metropolitan Government is precluded from raising the attorney's fee issue because the fees and expenses were awarded in an order entered October 16, 2002, and the Metropolitan Government's Notice of Appeal, filed October 17, stated it was

---

[45]This was a reduction from the amount requested, but Consolidated does not appeal the reduction.

appealing "from the final judgment entered on the 6th day of August 2002."[46]  Rule 3(f) of the Tennessee Rules of Appellate Procedure requires that the notice of appeal designate the judgment from which relief is sought:

> The notice of appeal shall specify the party or parties taking the appeal,[47] . . . shall designate the judgment from which relief is sought, and shall name the court to which the appeal is taken.  An appeal shall not be dismissed for informality of form or title of the notice of appeal.

The Metropolitan Government maintains that it was not required to file a separate notice of appeal from the attorney's fee judgment and that an appealing party may present any question of law for review under Tenn. R. App. P. 13(a).

This court has considered the consequence of failure to comply with the specific requirements of Tenn. R. App. P. 3(f) a number of times.[48]  The failure to specify a particular order as the basis of the appeal has received differing treatment, depending on the circumstances, particularly, whether the notice of appeal designates any judgment.  For example, in *Dunlap v. Dunlap*, 996 S.W.2d 803 (Tenn. Ct. App. 1999), the notice of appeal did not specify any particular judgment, but this court determined that this failure to comply with Tenn. R. App. P. 3(f) did not preclude the court from reviewing the issues raised in the appellant's brief.  996 S.W.2d at 810.  The court relied on Tenn. R. App. P. 13(a), which governs the scope of review on appeal and provides "any question of law may be brought up for review and relief by any party" as well as on the Advisory Committee Comment to Rule 13(a), which states, in part:

> This subdivision rejects use of the notice of appeal as a review-limiting device.  In federal practice the notice of appeal has limited review in two principal ways.  Some courts have limited the questions an appellant may urge on review to those affecting the portion of the judgment specified in the notice of appeal.  However, since the principal utility of the notice of appeal is simply to indicate a party's intention to take

---

[46]The trial court's memorandum and order of August 6 granting declaratory relief and ruling on both parties' motions for summary judgment stated, "This Memorandum and Order is a final judgment," but did not include a certification pursuant to Tenn. R. Civ. P. 54.02.  Because the complaint asked for an award of attorney's fees, the judgment did not become final until that claim was resolved.

[47]The rule has been amended, effective July 1, 2004, regarding the naming of parties when one attorney represents more than one party.  *See* Compiler's Notes to Rule 3.

[48]Many of the cases dealt with the requirement that the notice of appeal specify the party or parties taking the appeal.  *See*, *e.g. Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 533 (Tenn. Ct. App. 2003) (holding that the listing of one or more named party followed by "et al." is insufficient to meet the requirements of Tenn. R. App. 3(f) and this court could consider only the appeal of the sole party named in the notice of appeal); *Mairose v. Federal Express Corp.*, 86 S.W.3d 502, 510 (Tenn. Ct. App. 2002).  The reasoning behind these rulings was that this court has no jurisdiction over a person not specifically named as an appellant in the notice of appeal.  These cases no longer apply to the situation covered by the amendment to the rule.

an appeal, this limitation seems undesirable.  The federal courts have also limited the issues an appellee may raise on appeal in the absence of the appellee's own notice of appeal.  Here again, since neither the issues presented for review nor the arguments in support of those issues are set forth in the notice of appeal, there seems to be no good reason for so limiting the questions an appellee may urge on review.  The result of eliminating any requirement that an appellee file the appellee's own notice of appeal is that once any party files a notice of appeal the appellate court may consider the case as a whole.

In addition to Rule 13(a), the court considered the Advisory Commission Comment to the provision at issue, Rule 3(f), which states:

This subdivision specifies the content of the notice of appeal.  The purpose of the notice of appeal is simply to declare in a formal way an intention to appeal.  As long as this purpose is met, it is irrelevant that the paper filed is deficient in some other respect.  Similarly, the notice of appeal plays no part in defining the scope of appellate review.  Scope of review is treated in rule 13.  This subdivision read in conjunction with rule 13(a) permits any question of law to be brought up for review as long as any party formally declares an intention to appeal in timely fashion.

The *Dunlap* court also referenced prior holdings that, in view of the relationship between the two rules, a party's failure to comply with Tenn. R. App. P. 3(f) does not limit the issues that party may raise on appeal.  *See Glidden v. Glidden*, 1987 WL 9452, at *1-2 (Tenn. Ct. App. Apr. 16, 1987) (holding that appellant's designation of the final judgment but not designating the order denying a post-judgment motion to alter or amend sufficed to allow the appellant to raise and this court to consider any question of law or fact in the case as a whole); *Anderson v. Standard Register Co.*, No. 01A01-9102-CV-00035, 1992 WL 63421, at *2-3 (Tenn. Ct. App. Apr. 1, 1992)[49] (holding that where the trial court denied a motion to amend the complaint and subsequently granted summary judgment for the defendant and the plaintiff's notice of appeal designated the final judgment dismissing the complaint, the notice of appeal met the purpose of providing notice, the appellee was not prejudiced, the appeal was not hampered, and Tenn. R. App. P. 3(f) did not preclude the appellant from challenging the denial of the motion to amend the complaint).

Based on all these authorities and on its determination that the appellant's "oversight" in failing to designate the order appealed had neither prejudiced the appellee nor hampered the court's review of the appeal, the court determined that the appellant should be permitted to present in the appeal any question of law or fact involved in the case.  *Dunlap*, 996 S.W.2d at 811.  *See also Oakley v. Oakley*, No. W2002-00095-COA-R3-CV, 2003 WL 103215, at *6 (Tenn. Ct. App. Jan. 8, 2003) (relying on *Dunlap* and *Glidden* and holding that the appellant could raise all issues related to the only timely-filed notice of appeal which could only relate to the lower tribunal's denial of the

---

[49]The Tennessee Supreme Court affirmed on the merits the decision of the Court of Appeals, *Anderson v. Standard Register Co.*, 857 S.W.2d 555 (Tenn. 1993), but did not address the Rule 3(f) issue.

50

appellant's Tenn. R. Civ. P. 60 motion to set aside judgment, even though the notice of appeal only stated that appellants "appeal the dismissal of this case" and the original dismissal judgment was not timely appealed); *Strong v. Elkins*, 1987 WL 18069, at *2 (Tenn. Ct. App. Sept. 30, 1987) (holding that although the notice of appeal did not designate the judgment appealed, there could be no misunderstanding by appellee that the appellant intended to appeal from the *sua sponte* dismissal of his complaint, relying on Tenn. R. App. 1 and federal authority that an error in designating the judgment appealed from will not prevent review of the entire appeal if the notice manifests an intent to appeal from the judgment sought to be vacated).

However, this court has also reached the opposite conclusion where a specific judgment was designated but the designation was erroneous or did not include issues raised by the appellant. In *Hall v. Hall*, 772 S.W.2d 432 (Tenn. Ct. App. 1989), the relevant notice of appeal (as well as an earlier one that was dismissed as premature) designated a judgment of May 13, 1987, and the order denying a motion to alter or amend or for new trial and stated the appellant was appealing "from the alimony, support and property divisions" in the May 13 judgment. However, the appellant had included in the record a transcript of a contempt hearing held October 7, 1987, and in his brief the appellant challenged a contempt finding resulting from that hearing. This court determined that the October contempt order was not contemplated in either notice of appeal. Because of the designation required by Tenn. R. App. P. 3(f), "[i]nasmuch as the October, 1987, order related to a supplemental issue raised after entry of final judgment (albeit before finalized by the belated ruling on the "Motion to Amend or New Trial"), the clear and specific wording of the notices of appeal limits the issues on this appeal to the judgment designated in the notices." 772 S.W.2d at 436.

Relying on *Hall*, *supra*, this court has held that, when a specific judgment or order is designated in the notice of appeal, Tenn. R. App. P. 3 (f) limits the scope of appellate review to the judgment or order designated. *Goad v. Pasipanodya*, No. 01A01-9509-CV-00426, 1997 WL 749462, at *2 (Tenn. Ct. App. Dec. 5, 1997). In that case, the appellants' claims against two different defendants were dismissed by the trial court in two separate orders, one dated March 17, certifying the dismissal final under Tenn. R. Civ. P. 54.02, and the second dated June 19, 1995, also certifying the dismissal as final. The plaintiff filed a notice of appeal on July 24 stating he was appealing the trial court's June 19 order. Not only was the appeal dismissed as untimely as to each of the orders, this court also held that the appellant had not perfected an appeal of the earlier order because his notice of appeal designated only the second order. "Thus, Tenn. R. App. P. 3(f) limits his appeal to the June 19, 1995 order." *Id*., at *2.

Finally, in *Howse v. Campbell*, No. M1999-01580-COA-R3-CV, 2001 WL 459106 (Tenn. Ct. App. May 2, 2001), this court dealt with a premature notice of appeal designating a March 11, 1999, order that dismissed one of multiple defendants. That order did not become a final, appealable order until all remaining claims among all parties were adjudicated, at which time the premature notice of appeal, which had not been dismissed, became timely. By order dated March 22, 2000, the trial court dismissed the claims against all the remaining defendants. The appellant did not file another notice of appeal. The question before the court was whether the appellant could pursue appeal of the dismissal of the defendants in the March 22, 2000 order. We determined he could not,

holding that because his only notice of appeal did not state he desired to appeal from the March 22 order (and could not have, because the notice was filed months before that judgment), the notice of appeal applied only to the order it designated and this court would only consider those issues related to the dismissal of the first defendant. *Id*. at *3. In *Howse*, this court discussed the notice purposes underlying Tenn. R. App. P. 3(f) and determined that the appellant's failure to file a second notice of appeal undermined the notice function that notices of appeal are intended to serve, leaving the other parties to guess whether he intended to appeal either, both, or neither order of dismissal. *Id*.

In the case before us, there was only one defendant, and the notice of appeal was timely filed as to both orders. Consequently, some of the complications and alternative grounds for limiting the appeal that were present in the cases discussed are not involved here. However, the Metropolitan Government clearly indicated its intent to appeal from a specific judgment which was not the last order entered in the case. The Metropolitan Government, not an unsophisticated litigant, filed its notice of appeal after the attorney's fee order was entered, but did not refer to it. A reasonable interpretation of the notice of appeal is that the Metropolitan Government said what it meant, *i.e.*, that it intended to appeal only the judgment of August 6. It could therefore be argued that Consolidated was justified in relying on that interpretation, and, under *Hall, Goad,* and *Howse*, this court's review would be limited to the appellant's designation.

On the other hand, it would not be reasonable to assume that the Metropolitan Government was not seeking to reverse the award of attorney's fees if it won on the merits of its appeal, since Consolidated could no longer be considered a prevailing party. Consequently, it could be argued that Consolidated was on reasonable notice that the Metropolitan Government sought to reverse the award of fees whether or not it was successful in overturning the trial court on the merits.

We are aware of the varying interpretations of the requirements of Tenn. R. App. P. 3(f). Further, the clear preference is for liberality in interpreting a notice of appeal and the scope of appeal. While it is true that the Metropolitan Government's notice of appeal did not inform Consolidated that it intended to appeal the attorney's fee award, Consolidated cannot point to any prejudice it suffered from the failure of the Metropolitan Government to designate the attorney's fee judgment. In these circumstances, we think the better view is that the Metropolitan Government can raise any issue resulting from the trial court's final judgment. Accordingly, we will review the trial court's award of attorney's fees.

## B. PREVAILING PARTY

The attorney fee provision in 42 U.S.C. § 1988 states that a court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." As the language of the statute makes clear, the determination of whether to make an award of fees, as well as the amount of such fees, lies within the discretion of the trial court. A trial court's decision to grant or deny fees is reviewed for abuse of discretion. *Fogerty v. MGM Group Holdings Corp.*, 379 F.3d 348, 357 (6th Cir. 2004). That discretion is limited, however, by the requirement that only a prevailing party may qualify for a fee award. Additionally, if it is determined that a party meets the prevailing party

52

requirement, fees should be awarded "unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937 (1983).

The meaning of the term "prevailing party" has been the subject of a number of opinions by the United States Supreme Court. Recently, the Court has indicated that the meaning is relatively clear. In *Buckhannon Board and Care Homes, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 121 S.Ct. 1835 (2001), the Court ruled that a "prevailing party" does not include one who fails to secure a judgment or court-ordered consent decree, even though the desired result of the lawsuit is achieved because of a voluntary change in the defendant's conduct, thus declining to adopt the "catalyst" theory. In that opinion, the Court made it clear that to be a prevailing party, one must receive at least some judicially-sanctioned relief on the merits of his or her claim. 532 U.S. at 600-604, 121 S.Ct. at 1838-40.

Describing "prevailing party" as a term of art, the Court referred to the Black's Law Dictionary definition: "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded . . . Also termed successful party." A prevailing party is one who has been awarded some relief by the court. 532 U.S. at 603, 121 S.Ct. at 1839. In his concurring opinion, Justice Scalia points out that "prevailing party" is not "some newfangled legal term invented for use in late-20th-century fee-shifting statutes." 532 U.S. at 610, 121 S.Ct. at 1843. It has never meant a party who left the courthouse empty-handed; it has long meant that a judicial finding of liability was required. Justice Scalia's tracing of the history of the term of art led him to conclude that prevailing party has traditionally and "*invariably* - - meant the party that wins the suit or obtains a finding (or an admission) of liability." 532 U.S. at 615, 121 S.Ct. at 1846.

This threshold requirement has long existed. "Only where a party has prevailed on the merits of at least some of his claims . . . has there been a determination of the 'substantial rights of the parties,' which Congress determined was a necessary foundation for departing from the usual rule in this country that each party is to bear the expense of his own attorney." *Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987 (1980). In *Hensley*, the Court sought to clarify the standard where the plaintiff achieves only limited success. *Hensley*, 461 U.S. at 431, 103 S.Ct. at 1938. The Court defined a prevailing party as one who succeeded "on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.*

In *Texas State Teachers Ass'n. v. Garland Independent School Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 1493 (1989), the Court resolved a split among the circuit courts and rejected the standard requiring that a party succeed on the "central issue" in the case and achieve the "primary relief sought." 489 U.S. at 791, 109 S.Ct. at 1493. Instead, the Court reaffirmed the *Hensley* standard. The Court also reiterated that where the claims arise from a core set of facts and involve related theories of law, the degree of success the plaintiff attains is relevant to the size of the fee award, *i.e.*, whether the award is reasonable, not to the eligibility for an award, *i.e.*, whether the plaintiff is a prevailing party. 489 U.S. at 790, 109 S.Ct. at 1492; *see also Farrar v. Hobby*, 506 U.S. 103, 113, 113 S.Ct. 566, 574 (1992). The *Texas Teachers Ass'n* case established an exception where the plaintiff's success can be characterized as "purely technical or *de minimis*;" in that situation, the

plaintiff is not a prevailing party. *Texas State Teachers Ass'n*, 489 U.S. at 792, 109 S.Ct. at 1494. However, *Farrar* clarified that a party who is awarded only nominal damages is a prevailing party because prevailing party status does not turn on the magnitude of the relief obtained. *Farrar*, 506 U.S. at 114, 113 S.Ct. at 574.

In the case before us, Consolidated was successful in obtaining a declaratory judgment that the ordinances were unconstitutional, rendering them unenforceable against Consolidated or any other party. Consequently, it has met the baseline definition of "prevailing party." The Metropolitan Government, however, argues that Consolidated was not a prevailing party because the only relief granted it was a declaratory judgment that did not change the legal relationship between the parties and did not affect the behavior of the defendant toward the plaintiff.

Indeed, the Supreme Court has stated, "the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Texas State Teachers Ass'n*, 489 U.S. at 792-93; 109 S.Ct. at 1494. It has also held that the relief granted must "affect the behavior of the defendant toward the plaintiff." *Rhodes v. Stewart*, 488 U.S. 1, 4, 109 S.Ct. 202, 203 (1988).

> [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. . . . In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Farrar*, 506 U.S. at 111-12, 113 S.Ct. at 573. (citations omitted).

While a plaintiff who obtains only a declaratory judgment in his or her favor may qualify as a prevailing party, entry of such a judgment does not automatically compel that result. *Rhodes*, 488 U.S. at 3, 109 S.Ct. at 203. Rather, the question is whether the judgment produces some action or cessation of action by the defendant or otherwise affects the behavior of the defendant toward the plaintiff. "A declaratory judgment, in this respect, is no different from any other judgment." 488 U.S. at 4, 109 S.Ct. at 203.

In *Rhodes*, the two plaintiffs obtained a judgment requiring prison officials to comply with procedures in handling prisoner requests for magazines. At the time the trial court's order was entered, one plaintiff had died and the other was no longer incarcerated. The United States Supreme Court reversed the award of attorney's fees because the judgment afforded plaintiffs no relief since they were no longer in state custody. 488 U.S. at 4, 109 S.Ct. at 204. *See also Hewitt v. Helms*, 482 U.S. 755, 763 107 S.Ct. 2672, 2677 (1987) (holding that a mere favorable judicial statement of the law during litigation that results in judgment against the plaintiff does not make the plaintiff a

prevailing party and plaintiff did not get redress from the change in prison procedures since he was no longer in prison when the change was made).  These cases involved situations where the relief "could not in any way have benefitted either plaintiff."  *Rhodes*, 488 U.S. at 4, 109 S.Ct. at 203.

These holdings have been explained, in part, as resulting from the fact that the judgments did not alter the relationship between the parties because, at the time of the judgments, no relationship existed.  *See e.g., National Black Police Assoc. v. District of Columbia Board of Elections and Ethics*, 168 F.3d 525, 528 (D.C. Cir. 1979).  In that case, the court held that even though the case was moot by the time of appeal because the legislation challenged in the lawsuit had been repealed, the injunction against its enforcement was effective when issued, and for 52 days thereafter, and altered the relationship between the parties when it was issued.  *Id*.

While the required direct benefit to the plaintiff must exist at the time of the judgment, a plaintiff who establishes that he continues to have or is reasonably likely to have some legal relationship to the defendant can be a prevailing party.  *Barnes v. Broward County Sheriff's Office*, 190 F.3d 1274, 1278 n.3 (11th Cir. 1999) (holding that job applicant who obtained injunction prohibiting county from continuing use of preemployment psychological testing was not a prevailing party because, while it was conceivable he could benefit from the injunction if he reapplied for employment, he presented no evidence he was eligible or intended to reapply).  The *Barnes* court, and others, recognized that other contexts, such as employment, may be distinguishable from the prisoner context in *Hewitt* and *Rhodes* in the plaintiff's ability to show a continuing connection or relationship even though the immediate result of the judgment is not a direct benefit to the plaintiff.

For example, in *Webster Greenthumb Co. v. Fulton County*, 112 F. Supp. 2d 1339 (N.D. Ga. 2000), the court struck down a county's minority and female business enterprise program as violative of the Equal Protection Cause, entering a declaratory judgment and an injunction against the county.[50]  The court concluded that the plaintiff would directly benefit from the injunction because it was still in business and was reasonably likely to reapply for county contracts in the future.  112 F.Supp. at 1347.  Consequently, the plaintiff would directly benefit in the future from the judgment. The court also discounted the county's argument that the plaintiff had obtained only "moral satisfaction" because the program at issue was up for renewal in three months after the judgment was issued and was likely to be allowed to lapse.  The county argued the soon-to-be-non-existent program could not have harmed the plaintiff, so the judgment did not benefit it.  *Id*.  The court found this position inconsistent with the county's request for a stay of the injunction pending appeal.

In *Mendoza v. Licensing Board of Fall River*, ___ N.E.2d ___, 2005 WL 1090630 (Mass. May 11, 2005), the plaintiff was successful in having a city's public indecency ordinance that prevented nude dancing declared violative of the state constitution.  However, the court also found that the plaintiff was prohibited from offering nude dancing at his restaurant/bar because of

---

[50]The plaintiff, an unsuccessful bidder in the past, was also awarded $8,750 in compensatory damages.  The court found work related to the declaratory and injunctive relief was so entertwined with the damage award it provided a separate basis for the award of fees.  112 F.Supp. at 1348.

limitations placed in a previously-granted zoning variance that allowed operation of the restaurant/bar at its location. As to attorney's fees, the city argued the plaintiff was not a prevailing party because he had not obtained the practical relief he sought: the ability to present nude dancing at his business location. The court found that the declaratory and injunctive relief prohibiting enforcement of the ordinances on nude dancing constituted enforceable judgments that directly benefitted the plaintiff because they provided the plaintiff substantive rights to prevent enforcement of the ordinances against his business. 2005 WL 1090630, at *13.

> The judgments actively prevent the city and licensing board from pursuing unconstitutional courses of action, which they defended vigorously throughout the litigation. Because the city and licensing board are no longer able to enforce the adult entertainment ordinances or to deny Oliver's an adult entertainment license, [Plaintiff] is now eligible to apply for a zoning variance that would permit nude dancing.

*Id*.

Based on the various teachings of these cases, we conclude that Consolidated was a prevailing party. It obtained a judgment in its favor declaring the ordinances violative of Constitutional protections and, therefore, unenforceable. Had this judgment stood alone, there would be no serious question about Consolidated's status as a prevailing party. The complicating factor is the issuance by the trial court of the injunction prohibiting Consolidated from proceeding with development of the proposed landfill at the site at issue. Predictably and logically, the Metropolitan Government argues that because of that injunction, Consolidated did not achieve the practical result it sought, *i.e.*, the ability to develop the C&D landfill on the property it leased; the legal relationship between the parties was not changed; and the judgment did not affect Metro's behavior toward Consolidated.

We agree that the injunction mitigated the effect of the declaratory judgment. After careful consideration, however, we do not think it had the effect of rendering Consolidated a non-prevailing party. The effect of the declaratory judgment was to render the ordinances unenforceable. That was one of the primary benefits sought. The injunction required Metro to adopt ordinances correcting the constitutional infirmities within a specified time. Therefore, the judgment affected the Metropolitan Government's behavior toward Consolidated. If Metro did not act within the deadline established by the court, it could not have prevented Consolidated from constructing the landfill where it proposed.

Accordingly, we affirm the trial court's determination that Consolidated was a prevailing party.

## C. Reasonable Fees

Even a party who qualifies as a prevailing party may not be entitled to an award of fees because such award would not be reasonable. The Metropolitan Government argues that, even if Consolidated is determined to be a prevailing party, its victory was only technical and the relief it obtained was so nominal in comparison to the relief sought, that the "only reasonable fee is . . . no fee at all," relying on *Farrar*, 506 U.S. at 115, 113 S.Ct. at 575.

As set out earlier, the nature of relief obtained is relevant to the amount of fees awarded and to the exercise of discretion by the trial court in determining that amount. *Farrar*, 506 U.S. at 114, 113 S.Ct. at 574. That is because the court must consider the relationship between the extent of success and the amount of the fee award. *Hensley*, 461 U.S. at 438, 103 S.Ct. at 1942. The degree of overall success is an important, or even the most critical, factor in determining the reasonableness of a fee award. *Id.*; *Texas Teachers* Ass'n., 489 U.S. at 793, 109 S.Ct. at 1493-94; *Hensley*, 461 U.S. at 436, 103 S.Ct. at 1941.

In *Farrar*, the plaintiff was awarded nominal damages of one dollar, although he sought seventeen million dollars, upon a jury finding that the defendant had deprived him of a unspecified civil right. The trial court awarded $280,000 in fees based on the time spent on the litigation as a whole without considering the relationship between the extent of success and the amount of the fee, thereby failing to engage in "any measured exercise of discretion." *Farrar*, 506 U.S. at 114, 113 S.Ct. at 575. Although the Supreme Court reversed the intermediate appellate court's holding that the plaintiff was not a prevailing party, it determined the award was improper and that the plaintiff was entitled to no fees.[51]

The Court in *Farrar* did not hold that a plaintiff who is awarded only nominal damages is never entitled to an award of fees. Instead, it held that the trial court should consider the degree of success in determining what is a reasonable award. If the sole purpose of a lawsuit is a monetary judgment for damages, failure to obtain such a judgment is indicative of lack of success. *Farrar*, 506 U.S. at 115, 113 S.Ct. at 575. In that situation, a plaintiff may be entitled to no fees, even though it was a prevailing party. *Id.* If the lawsuit achieved other tangible results, however, a fee award may be justified. *Wilcox v. City of Reno*, 42 F.3d 550, 555 (9th Cir. 1994).

In *Wilcox*, the plaintiff brought suit for injuries he sustained during an arrest that was captured on videotape. In the claim relevant herein, he challenged the city's use of force policy. The jury found the city's policy resulted in the use of excessive force and that this policy proximately caused the plaintiff's injuries, but awarded him one dollar in damages. The trial court awarded the plaintiff attorney's fees of $66,000, a reduction from the $111,000 requested. The Ninth Circuit

---

[51]In a concurring opinion, Justice O'Connor stated that if ever there was a plaintiff who deserved no fees at all, it was this plaintiff and explained why. 506 U.S. at 116-122, 113 S.Ct. at 575-579. Four judges disagreed with the majority determining the amount of fees due rather than remanding for reconsideration of the fee amount upon application of relevant factors. 506 U.S. at 123-124, 113 S.Ct. at 579-80.

affirmed the award on the basis the trial court did not abuse its discretion. The trial court held a hearing, reduced the request, made findings supported by the record, and properly analyzed controlling authority. The appellate court held that the determination that the policy was unconstitutional was significant and that the benefits from that determination were among the purposes of the litigation. 42 F.3d at 556-557. The court also found that counsel for plaintiff expended significant time "litigating against a resistant city that steadfastly defended its unconstitutional use of force policy."

With all these principles and holdings in mind, we examine the award at issue here in view of the applicable standard of review. A trial court has broad discretion in deciding whether to award fees to a prevailing party and the amount of fees that are reasonable. "It is central to the awarding of fees under § 1988 that the district judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case." *Blanchard v. Bergeron*, 489 U.S. 87, 96, 109 S.Ct. 939, 946 (1989). The trial court is usually in the best position to make fee award decisions because it has more closely observed and gained a greater understanding of the litigation, the lawyering, and the results. *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1491. "The [trial] court is in the best position to ascribe a reasonable value to the lawyering it has witnessed and the results that lawyering has achieved." *Wilcox*, 42 F.3d at 555.

In the case before us, the trial court entered a thorough memorandum and order on its fee award decision. The order notes that Consolidated requested fees of $133,541.24. The court found that counsel had made an effort to limit his request to fees directly related to the prevailing claims, presumably eliminating work on the takings and exclusionary zoning claims, but was not always successful. The court found counsel's elimination of work on other claims did not prevent the court from considering the significance of the overall relief obtained. The court also found that some of the work done in the litigation was excessive and duplicative, found lead counsel's hourly rate to be reasonable, but established rates for other counsel.

The trial court's order sets forth the guiding legal principles applicable to fee awards and the court's application of those principles. The court found the critical factor was the degree of success, weighed the results against the scope of the litigation, accounted for counsel's leaving out work on unsuccessful claims, and reduced the request by almost one-third.

For the same reasons we determined Consolidated was a prevailing party, we conclude that the relief Consolidated obtained was not so technical or insignificant as to justify an award of no fees. Consolidated demonstrated that the ordinances at issue deprived it of Constitutionally-protected rights. We do not consider such a result insignificant or its benefit negligible. While the practical benefit to Consolidated of the declaratory judgment was diminished by the injunction, it was not eliminated unless and until new constitutionally valid ordinances with the same effect were adopted. We think an award of fees was reasonable in view of the totality of the litigation. More correctly, we hold the trial court did not abuse its discretion in refusing to award no fee.

With regard to whether the actual amount awarded was reasonable, the Metropolitan Government has not argued that some amount other than zero would have been more reasonable. In any event, our review of the trial court's memorandum and order shows that court acted within its discretion and considered all the necessary factors. That court was more familiar with the conduct of the litigation and the efforts of the lawyers. We will not substitute our judgment as to a reasonable amount for the trial court's.

Accordingly, we affirm the award of attorney's fees.

## CONCLUSION

We conclude that Consolidated was not precluded from bringing its facial challenge to the ordinances on substantive due process and equal protection grounds. We also hold that the trial court correctly determined that the ordinances violate those Constitutional protections. Finally, we affirm the trial court's award of attorney's fees.

Costs of this appeal are taxed to the Metropolitan Government of Nashville and Davidson County.

_____
PATRICIA J. COTTRELL, JUDGE